888 F.2d 949
 Salvatore LUNA, Plaintiff-Appellant,
v.
Dr. HARRIS, Dr. Howe, P.F. Calahan, Paul O'Brein, Mr. Rugg,
Larry Simon, Danny Doe, Pat Doe, Art Doe, Kim Zokowlski,
Jinny Doe, Sage Doe, John Doe, John Doe, John Doe, John Doe,
John Doe, Jane Doe, Jane Doe, Jane Doe, Jane Doe, Diane
Windhorst, Domenic Scalise, Kenny Karabec, Rick Doe,
Defendants-Appellees.
 No. 913, Docket 87-7732.
 United States Court of Appeals,
Second Circuit.
 Argued March 20, 1989.
Decided Oct. 26, 1989.
 
 Charles E.F. Millard, Jr., New York City (Ogden N. Lewis, Davis Polk & Wardwell, New York City, of counsel), for plaintiff-appellant.
 Dennis Milton, Asst. Suffolk County Atty., Hauppauge, N.Y. (E. Thomas Boyle, Suffolk County Atty., Warren G. Clark, Asst. Suffolk County Atty., Hauppauge, N.Y., of counsel), for defendants-appellees.
 Before OAKES, Chief Judge, MAHONEY, Circuit Judges, and WOOD, District Judge.*
 MAHONEY, Circuit Judge:
 
 
 1
 Plaintiff-appellant Salvatore Luna appeals from a summary judgment entered in the United States District Court for the Eastern District of New York, Raymond J. Dearie, Judge, dismissing Luna's challenge to a New York State regulation governing methadone take-home privileges for patients in methadone treatment programs. Luna contends that the pertinent New York regulation posits more stringent requirements with respect to employment than its federal counterpart, which assertedly preempts the state requirement.
 
 
 2
 In an opinion reported at 666 F.Supp. 33 (E.D.N.Y.1987), the district court rejected this contention, and granted summary judgment to defendants-appellees. We agree, and accordingly affirm.
 
 Background
 
 3
 Plaintiff-appellant Salvatore Luna is a patient in the Suffolk County Methadone Treatment Program (the "Program"), which affords a broad array of treatments, including methadone detoxification. Luna initiated this action with a class action pro se complaint seeking monetary and injunctive relief from various employees of the Suffolk County Department of Health Services for alleged illegal practices by those employees in the conduct of the Program.
 
 
 4
 Negotiations between the parties resulted in a stipulation, approved by the district court, which resolved many of the issues in this litigation. The stipulation specified that "[t]his is not a class-action lawsuit and the only plaintiff is SALVATORE LUNA." Only the issue of federal preemption is presented on this appeal.
 
 
 5
 The preemption claim involves N.Y.Comp.Codes R. & Regs. tit. 14, Sec. 1040.11 (1984) and 21 C.F.R. Sec. 291.505(d)(8)(iv) and (v) (1988), which deal with take-home requirements for patients undergoing methadone treatment. These regulations provide various "stages" of take-home eligibility. Luna's contention is that the state regulation is more stringent and less permissive than its federal counterpart, and that this is impermissible because of federal preemption.
 
 
 6
 Section 1040.11, the New York regulation, establishes the various stages for take-home eligibility in the following terms under the heading "[l]ength of treatment":
 
 
 7
 (i) If the patient has been admitted for less than three months (including the stabilization period), daily clinic visits are required unless the program is only open six days a week, in which case one daily take-home dose may be issued weekly.
 
 
 8
 (ii) If the patient has been admitted more than three months but less than two years, no less than three clinic visits weekly are required. No more than two take-home doses may be issued at any time, and no more than a total of four take-home doses in any week.
 
 
 9
 (iii) If the patient has been admitted for at least two years but less than three years, no less than two clinic visits per week are required. No more than three take-home doses may be issued at any time, and no more than a total of five take-home doses in any week.
 
 
 10
 (iv) If a patient has been admitted for three years, a six-day supply of methadone may be provided.
 
 
 11
 N.Y.Comp.Codes R. & Regs. tit. 14, Sec. 1040.11(a)(1) (1984).
 
 
 12
 The patient must satisfy numerous additional requirements, including the one under challenge in this litigation: "[p]rogress in maintaining a stable lifestyle, evidenced by: ... employment, school attendance or other appropriate activity." Id. Sec. 1040.11(a)(3)(v). For ease of reference, this provision is hereinafter described as the "employment requirement." It applies to all take-home privileges except, apparently, the one daily take-home dose authorized for weekly issuance by section 1040.11(a)(1)(i) where a clinic is closed one day a week.
 
 
 13
 The comparable federal regulations provide a number of discretionary factors to be considered in allowing take-home methadone medication, 21 C.F.R. Sec. 291.505(d)(8)(iv) (1988), and authorize take-home medication based upon length of treatment in provisions which generally accord with the state regulations quoted above, see id. Sec. 291.505(d)(8)(v)(a).[1] The only federal requirement as to employment, however, relates exclusively to the fourth (three-year) stage at which both the New York and federal regulations allow a patient to take home a six-day supply of methadone, and requires that:
 
 
 14
 the patient is employed (or actively seeking employment), attends school, is a homemaker, or is considered unemployable for mental or physical reasons by a program physician.
 
 
 15
 Id. Thus, New York imposes an employment requirement that not only differs in terms from its federal counterpart, but more importantly, is applicable to the second (three-month) and third (two-year) stage of take-home methadone medication, while the federal requirement is not.
 
 
 16
 Luna is currently precluded from any take-home privileges because he is unemployed, and the parties have stipulated that he would be allowed take-home privileges without regard to his employment status, assuming other applicable requirements were met, if the preemption issue were resolved in his favor.[2]
 
 
 17
 Luna contends that the New York employment requirement is preempted because: 1) it precludes proper utilization of the balancing test mandated by federal regulations in determining take-home privileges; 2) the history of the federal regulation reveals that employment is not to be a prerequisite to take-home privileges; and 3) the requirement conflicts with the federal regulations' policy of flexibility and goal of rehabilitation.
 
 
 18
 The district court ruled, however, that the New York regulation was not preempted, because the federal regulations do not express any intent to preempt state law or reflect any intent to occupy the entire field of drug rehabilitation, and because there was no actual conflict between the federal and state regulations; i.e., compliance with the New York regulation would not provide an obstacle to the accomplishment and execution of federal purposes and objectives. Luna v. Harris, 666 F.Supp. 33, 34-36 (E.D.N.Y.1987).
 
 
 19
 This appeal followed. After oral argument, we invited the Federal Drug Administration (the "FDA"), which promulgated the allegedly preempting federal regulation, and the Attorney General of the State of New York to submit amicus briefs stating their views of the preemption issue. Both subsequently provided the court with letter briefs contending that the New York employment requirement is not preempted by the federal regulation.[3]
 
 Discussion
 
 20
 It is hornbook constitutional law that federal law preempts conflicting state law. U.S. Const. Art. VI; see Northwest Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas, --- U.S. ----, 109 S.Ct. 1262, 1273, 103 L.Ed.2d 509 (1989). The Supreme Court has established three ways in which federal law may preempt state law:
 
 
 21
 First, in enacting the federal law, Congress may explicitly define the extent to which it intends to preempt state law. E.g., Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95-96, 103 S.Ct. 2890, 2898-2899, 77 L.Ed.2d 490 (1983). Second, even in the absence of express pre-emptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government. E.g., Fidelity Federal Savings & Loan Assn. v. De la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Finally, if Congress has not displaced state regulation entirely, it may nonetheless pre-empt state law to the extent that the state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is impossible, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). See also Fidelity Federal Savings & Loan Assn., supra, 458 U.S., at 153, 102 S.Ct., at 3022.
 
 
 22
 Michigan Canners & Freezers Ass'n v. Agricultural Mktg. & Bargaining Bd., 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984).
 
 
 23
 With respect to proving an actual conflict, there is a "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause." Hillsborough County v. Automated Medical Laboratories, 471 U.S. 707, 715, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985). This presumption is overcome only where there is clear evidence that Congress or the pertinent federal agency intends the federal interest to predominate over the state's police power. See id.; see also Darling v. Mobil Oil Corp., 864 F.2d 981, 986 (2d Cir.1989).
 
 
 24
 Although the federal provision relevant here is a regulation rather than a statute, it is well established that federal regulations have the same preemptive effect as federal statutes. See, e.g., Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta, 458 U.S. 141, 153-54, 102 S.Ct. 3014, 3022-23, 73 L.Ed.2d 664 (1982); Blum v. Bacon, 457 U.S. 132, 145-46, 102 S.Ct. 2355, 2363, 72 L.Ed.2d 728 (1982). In construing regulations, "the interpretation of an agency charged with the administration of a statute is entitled to substantial deference." Blum, 457 U.S. at 141, 102 S.Ct. at 2361.
 
 
 25
 We are concerned here only with the question whether the state and federal regulations actually conflict. Indeed, Luna makes no claim that the pertinent federal regulation expressly displaces state law or impliedly occupies the field of methadone maintenance program regulation. On the contrary, the federal regulations envision considerable state regulation, as evidenced by their express provision that all methadone maintenance programs must be approved by the appropriate state authority and "conform to all State requirements for conducting a methadone treatment program." 21 C.F.R. Sec. 291.505(c)(5) (1988).
 
 
 26
 Luna contends, however, both that simultaneous compliance with the New York and federal regulations is impossible, and that the New York regulation conflicts with federal objectives. The two claims collapse into one, because to determine whether it is possible to comply with both the federal and New York regulations, we must consider federal objectives in regulating drug treatment programs.
 
 
 27
 In 1970, Congress enacted the Comprehensive Drug Abuse Prevention and Control Act (the "1970 Act"), which provided inter alia that "[t]he Secretary of Health Education and Welfare ... shall determine the appropriate methods of professional practice in the medical treatment of ... narcotic addiction...." See 42 U.S.C. Sec. 257a (1982) (codification of 1970 enactment substituting Secretary of Health and Human Services for Secretary of Health Education and Welfare). In 1974, Congress enacted the Narcotic Addict Treatment Act of 1974 (the "1974 Act"), which established further requirements for the "maintenance treatment" of narcotics addicts. This statute provides that every practitioner who dispenses narcotics for maintenance treatment must obtain a separate federal registration, the issuance of which is conditioned upon standards established by the Secretary of Health and Human Services and the Attorney General of the United States. See 21 U.S.C. Sec. 823(g) (1982).
 
 
 28
 Pursuant to this authority, the FDA, which is established in the Department of Health and Human Services, see 21 U.S.C.A. Sec. 393 (West Supp.1989), has promulgated regulatory guidelines for the establishment and operation of methadone treatment programs for narcotics addicts. See 21 C.F.R. Secs. 291.501, 291.505 (1988). As previously stated, the federal regulations provide for three levels of take-home privileges, only the last of which contains an employment requirement. New York, on the other hand, makes "employment, school attendance or other appropriate activity" a prerequisite for any take-home privileges.
 
 
 29
 We discern no evidence that the New York employment requirement is in conflict with federal regulatory policy; rather, we find strong evidence to the contrary. As stated earlier, all methadone maintenance programs must be approved by the appropriate state authority and "conform to all State requirements for conducting a methadone treatment program." 21 C.F.R. Sec. 291.505(c)(5) (1988). Furthermore, the preamble to the 1980 federal regulations which first established federal standards for take-home privileges states that "[a] state authority may require prior approval or prohibit take-home medication altogether if it considers it necessary." 45 Fed.Reg. 62,70 5 (1980). Additionally, the text of the regulations stated that "[i]t is not the intent of this regulation to prescribe a particular treatment and rehabilitative service or the frequency at which a service should be offered." 21 C.F.R. Sec. 291.505(d)(5)(v)(b) (1988). Thus, even to the extent that the goal of federal regulations is rehabilitative, those regulations clearly contemplate states setting more stringent take-home requirements. Cf. California Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 582-84, 107 S.Ct. 1419, 1426-27, 94 L.Ed.2d 577 (1987) (federal regulations do not reflect intent to preempt state law where regulations expressly contemplate coincident compliance with state law).
 
 
 30
 The history of Congress' enactment of the 1974 Act reinforces this view. The passage of the 1970 Act resulted in a substantial increase in the number of methadone treatment clinics nationwide. H.Rep. No. 884, 93d Cong., 2d Sess. 2, reprinted in 1974 U.S.Code Cong. & Admin.News 3029, 3030. As a result, the risk of illegal diversion of methadone increased. The 1974 Act was passed primarily to respond to this problem. Its chief purpose was "to curb the diversion and abuse of narcotic drugs used in the treatment of narcotic addicts." S.Rep. No. 192, 93d Cong., 1st Sess. 2 (1973).[4] Congress found that "the use of methadone in the treatment of heroin addiction involves unique and unusually great risks of diversion and criminal profiteering," id. at 11, and noted that a frequent source of illicit methadone was diversion by addicts abusing take-home privileges, id. at 8-9. The 1974 Act was accordingly designed to "permit flexibility in treatment, while requiring adequate accountability for narcotic drugs administered in that treatment. It ... provide[s] a statutory complement to the FDA regulation, and provide[s] more specific controls over diversion." H.Rep. No. 884, 93d Cong., 2d Sess. 4, reprinted in 1974 U.S.Code Cong. & Admin.News 3029, 3032.
 
 
 31
 Furthermore, the FDA maintains in its amicus brief that there is no preemption here, and we are required to accord substantial deference to that view. Blum v. Bacon, 457 U.S. at 140-42, 102 S.Ct. at 2360-62. This is especially the case where the Program alleged to conflict with federal policy has in fact been approved by the FDA, as is required by the applicable federal regulation. See 21 C.F.R. Sec. 291.505(c)(5) (1988).
 
 
 32
 We therefore find no actual conflict between New York's employment requirement and federal regulations. Rather, the New York requirement furthers the federal objective of reducing the illicit diversion of methadone. We conclude that the applicable federal provision only established a regulatory floor, and New York's more stringent employment requirement can accordingly coexist with the federal regulation.
 
 
 33
 Finally, we see no conflict between our holding and the two Supreme Court cases upon which Luna places reliance. In both Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), and Blum v. Bacon, 457 U.S. 132, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982), the challenged state action was at odds with an unambiguously expressed preemptive intention in the pertinent federal regulation. See Fidelity, 458 U.S. at 154-55, 102 S.Ct. at 2368-69; Blum, 457 U.S. at 140-42, 102 S.Ct. at 2360-62. No comparable situation is presented here.
 
 Conclusion
 
 34
 The judgment of the district court is affirmed.
 
 
 
 *
 The Honorable Kimba M. Wood, United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 The differences are that the federal regulations do not include the state limitations as to a total of four and five take-home doses in any week at the second (three-month) and third (two-year) stages of treatment
 
 
 [2]
 The record indicates that adherence to the employment requirement is not always required, since Luna has apparently at times been accorded some take-home privileges while unemployed, and (at least in the view of defendants-appellees) was demoted to his present status (no take-home privileges) for reasons other than his failure to meet the employment requirement. A stipulation between the parties, however, as construed by the district court in ruling on a motion by Luna to be restored to take-home privileges, establishes that the employment requirement would preclude any advancement by Luna to take-home privileges at this juncture, assuming he met all other state requirements. Accordingly, the issue which Luna brings to us on this appeal is not moot, and he has standing to raise it. See Iron Arrow Honor Soc'y v. Heckler, 464 U.S. 67, 70, 104 S.Ct. 373, 374, 78 L.Ed.2d 58 (1983) (mootness); United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980) (standing); Martin-Trigona v. Shiff, 702 F.2d 380, 386 (2d Cir.1983) (mootness). In any event, Luna's continuing claim for damages precludes a determination of mootness. See, e.g., Stokes v. Village of Wurtsboro, 818 F.2d 4, 6 (2d Cir.1987); Beyah v. Coughlin, 789 F.2d 986, 988-89 (2d Cir.1986)
 
 
 [3]
 Purportedly pursuant to 28 U.S.C. Sec. 2403(b) (1982), the Attorney General of the State of New York also addressed a pre-argument letter to this court to the same effect
 
 
 [4]
 This description referred to the Methadone Diversion Control Act of 1973, the original Senate version of the 1974 Act. See H.Rep. No. 884, 93d Cong. 2d Sess. 2 (1973), reprinted in 1974 U.S.Code Cong. & Admin.News 3029, 3030