Lawrence CUSHING, Regina Belser, Alan Howard, Susan Allegra, Geri Randolph, "Jane Doe", Marieta Lugo, Joseph Krzemenski, Robert Gamari, individually and on behalf of all those similarly situated, Plaintiffs,

v.

Frank MOORE, William H. Benton, Essie Mariah M. Carstarphen, and as Directors, and/or Supervisors of Whitney J. Young, Jr. Health Center, Inc., d/b/a Whitney J. Young, Jr. Rehabilitation Clinic and Whitney J. Young Jr. Health Center, Inc., d/b/a Whitney J. Young, Jr. Rehabilitation Clinic, Defendants.

No. 92–CV–0068.

United States District Court, N.D. New York.

Jan. 29, 1992.

Bond Schoeneck & King, Arthur J. Siegel, Hermes Fernandez, Albany, N.Y., for plaintiffs.

Hinman Straub Pigors & Manning, Eileen M. Considine, John R. Saccocio, Paula Fitz Battiste, Albany, N.Y., for defendants.

## MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

Plaintiffs, nine patients of co-defendant Whitney J. Young, Jr. Health Center, Inc.'s Rehabilitation Clinic ("Whitney Young" or "Clinic"), commenced this action on January 14, 1992 against Whitney Young and some of its Directors and Supervisors.[1] In

---

1. One of the plaintiffs is listed as "Jane Doe," for purposes of confidentiality. Plaintiff's counsel has stated that he will reveal her name if the court wishes an *in camera* review of her file.

The court finds no reason to order an *in camera* review of the file.

Also, plaintiffs bring this suit individually and "on behalf of all of those similarly situated."

their complaint, plaintiffs allege that the Center, in promulgating new policies, violated federal regulations and state statutory, regulatory, and common laws governing plaintiffs' "take-home medication" privileges.

The case is before the court today on plaintiffs' motion for a preliminary injunction, compelling defendants to restore plaintiffs' take-home medication privileges.[2] The court has considered the parties' written submissions and oral arguments in conjunction with the controlling law. The following constitutes the court's decision on plaintiffs' motion for preliminary injunction.

## I. FACTS

The plaintiffs are nine recovering heroin addicts. Complaint ¶ 18. They are deemed "recovering" addicts presumably because they are fighting to control their addictions through medical treatment and counseling. To that end, plaintiffs are enrolled in Whitney Young's Rehabilitation Clinic, located in Albany, New York. Defendant Frank Moore, M.D., is the Medical Director of the Clinic; defendant William Benton is the Clinic's Program Director.

The Clinic provides its opiate-dependant patients with numerous programs designed to foster the patients' recoveries from their addictions. Among the programs are individual and group counseling, referrals to vocational training, support groups, "Narcotics Anonymous" meetings, HIV education, and referrals to patient detoxification and inpatient rehabilitation programs. Benton Aff. (1/21/92) ¶ 5. The Clinic also operates a methadone treatment program for its heroin-addicted patients, among whom are the plaintiffs. *Id.;* Complaint ¶ 18. The Clinic's administration of its methadone treatment program *vis-a-vis* the plaintiffs is at the center of the controversy before the court today.

### A. *Whitney Young's Methadone Treatment Program*

Methadone is a dangerously addictive drug that is used for treatment of heroin addiction. *See, e.g.* Dorland's Medical Dictionary 1018 (27th ed. 1988). Apparently, methadone treatment entails substitution of methadone addiction for a patient's heroin addiction, followed by treatment of the methadone addiction. Defendant Moore asserts that "[n]umerous studies have concluded that methadone, when properly administered as part of a program, provides a medically safe, relatively inexpensive and effective treatment for opiate addiction." Moore Aff. (1/21/92) ¶ 17.

Because methadone is so highly addictive, it is subject to misuse and abuse. *See, e.g.,* N.Y.Comp.Codes R. & Regs. ("NYCRR") tit. 14, § 1040.11(a) (1985); Spunt, Hunt, Lipton & Goldsmith, *Methadone Diversion: A New Look,* J. Drug Issues 569 (Fall 1986).[3] Consequently, the United States Food and Drug Administration ("FDA") and the New York State Division of Substance Abuse Services ("NYDSAS") have promulgated elaborate regulations governing methadone's medicinal use. *See* 21 C.F.R. § 291.501 (1991); 14 NYCRR § 1040. Most notably (for purposes of this discussion), the FDA regulations dictate that methadone may be administered only through an FDA-approved "narcotic treatment program." A program must satisfy numerous criteria before receiving FDA approval, *e.g.* 21 C.F.R. §§ 291.505(a)(6), (b)(2)(1) (1991), and must operate in compliance with intricate FDA regulations. *See generally id.* § 291.505; *see also* 14 NYCRR § 1040.2–.3 (NYDSAS approval requirement). A program's failure to comply with FDA and/or NYDSAS regulations could result in revocation of the program's authority to administer methadone treatment. 21 C.F.R. § 291.505(i)(1); 14 NYCRR § 1010.8–.10.

Whitney Young has satisfied all of the federal and state requirements, and there-

---

Plaintiffs allege in their complaint that class certification, pursuant to Fed.R.Civ.P. 23, is warranted and necessary.

2. On January 16, 1992, the court denied plaintiffs' motion for a temporary restraining order.

3. *See* Benton Aff. exh. "A".

fore operates an authorized methadone treatment program. The Clinic currently administers methadone. treatment to approximately 180 opiate-dependant patients. Benton Aff. ¶ 6. The plaintiffs are among the 180 patients enrolled in the methadone treatment program. Complaint ¶ 18.

### B. Plaintiffs' Take–Home Methadone Treatment

One of the FDA rules governing methadone treatment concerns "take-home" treatment. 21 C.F.R. § 291.505(d)(6)(iv)–(vi). NYDSAS has also issued specific regulations governing take-home treatment. 14 NYCRR 1040.11. If all of the criteria for a given patient are satisfied, then a program may administer methadone treatment on a take-home basis, subject to the procedures set forth in the FDA and NYDSAS regulations.

Briefly, the FDA and NYDSAS procedures require new patients to appear at the Clinic daily for their methadone treatment and examination. As the patient progresses in his treatment, the Clinic may scale back that patient's requirement to appear at the Clinic daily for treatment and examination, by means of "take-home" treatment. Initially, the patient would appear six days per week, and on the sixth day he may "take-home" the appropriate dosage for the seventh day. If the patient shows continued progress, the Clinic may further scale back the patient's requirement to appear, by allowing the patient to take home methadone twice per week, then three times per week, *et cetera*. If the patient and Clinic satisfy all of the criteria set forth in the regulations, then methadone treatment can ultimately be administered so that a qualified patient need only appear at the Clinic once per week, to take home a week's supply of methadone. All take-home patients must appear at least once per week, however, for a refill and examination. *See generally* 21 C.F.R. § 291.-505(d)(6)(v).

In August, 1991, 78 of the Clinic's 180 methadone patients received treatment on a take-home basis. Benton Aff. ¶ 38. The plaintiffs were among the 78 patients re-ceiving take-home treatment. Complaint ¶ 18. Plaintiffs were at various stages of take-home treatment, ranging from two to five Clinic appointments per week for refills and examinations. Since methadone is administered on a daily basis, the take-home arrangement was advantageous to the plaintiffs, many of whom would otherwise face extreme difficulty in reaching the Center to take the drug. Whitney Young's administration of methadone to the plaintiffs was allegedly done in compliance with FDA standards governing the administration of methadone to patients on a take-home basis.

In August, 1991, certain incidents occurred which prompted Whitney Young to review its take-home treatment policies. Most notably, the Clinic was cited by the FDA for deficiencies in its take-home treatment program. This was not the first time that the Clinic was cited for deficiencies. To make matter worse, four of the Clinic's patients were arrested later in that same month, and charged with the sale or possession of controlled substances. Some of the patients/arrestees were charged with possession and/or sale of methadone. According to defendant Benton, "[t]he publicity surrounding these arrests gave rise to many questions from the public as to the operation of the Clinic's methadone maintenance treatment program." Benton Aff. ¶ 35.

On September 9, 1991, Whitney Young temporarily suspended its take-home program, pending completion of an internal review of its take-home procedures. Consequently, the 78 patients who had been receiving their methadone treatment on a take-home basis had to report to the Clinic daily in order to receive their treatment.

Whitney Young completed its review within one week. The review resulted in the Clinic's enactment of new policies governing take-home procedures. Plaintiffs allege that the new policy lists nineteen circumstances under which the Center will automatically refuse methadone treatment on a take-home basis. *See* Policy *in* Complaint exh. "B". Among the circumstances which, according to plaintiffs, mandate au-

tomatic suspension of treatment on a take-home basis are:

- —evidence/report of illicit drug use;
- —outstanding clinic bill;
- —unemployed status, unless the patient is involved in education and/or training;
- —involvement in current criminal activity;
- —failure to comply with treatment recommendations;
- —signs of emotional instability, alcohol abuse, or unstable lifestyle.

*See id.* Also, patients who are also under other prescriptions in addition to methadone are ineligible for take-home treatment under the new policy. *Id.*

Upon institution of the procedures, the Clinic immediately restored take-home privileges to 51 of the 78 affected patients. The plaintiffs, however, were still not permitted to receive methadone treatment on a take-home basis. Since six of the nine plaintiffs were unemployed, termination of their take-home treatment was allegedly automatic; that is to say, the sole basis for termination of their treatment was the operation of the new policy. Pl.Mem. at 10. Take-home treatment for the remaining three plaintiffs was allegedly terminated shortly after Whitney Young's institution of its new policy, on the ground that they had used other drugs while taking methadone. *Id.* at 11. Plaintiffs contend that the "other drugs" were prescribed drugs which plaintiffs were required to take for medical reasons, and that the Clinic knew about the plaintiffs' other prescriptions.

Plaintiff's counsel has vividly portrayed the hardship the plaintiffs suffer as a result of the Clinic's enforcement of its new policy. *See* Pl.Mem. at 12–14. The extensive time and travel requirements demanded by the new policy have forced some plaintiffs to relinquish their jobs and incur overwhelming debt. Specifically, two plaintiffs—Lawrence Cushing and Geri Randolph, who are married to each other—have had to secure temporary living arrangements in Albany, because the daily commute to Whitney Young from their Vermont home became too costly and time consuming. Cushing's and Randolph's move to Albany caused them to lose their Vermont jobs, thus placing them in dire financial straits. Recently, Cushing and Randolph put their Vermont home up for sale in order to avoid foreclosure.

Plaintiff Jane Doe, an accountant who continues to lose clients—and therefore income—as a result of time spent at her daily Clinic appointments, was unable to continue her car payments; her car was recently repossessed. Plaintiffs Robert Gamari, Joseph Krzemenski, and Alan Howard have incurred such substantial expenses in having to travel to the Clinic on a daily basis that they face eviction or even lack of food.

Plaintiffs allege that other non-monetary hardships have resulted, as well. Plaintiff Susan Allegra's take-home treatment was terminated because she was under prescription for another medication. When she attempted to stop taking her prescribed medication so as to allow her to resume take-home methadone treatment, Allegra suffered a nervous breakdown and was subsequently hospitalized in a psychiatric center. Similarly, plaintiff Regina Belser allegedly suffers from an anxiety disorder as a result of the Clinic's termination of her take-home privileges. Plaintiffs Marieta Lugo and Robert Gamari have children who are suffering physically and/or emotionally from their parents' continued travel and hardship.

### C. Plaintiffs' Complaint

On January 13, 1992, plaintiffs brought this suit on their own behalf "and on behalf of all of those similarly situated," against Whitney Young and some of its directors and/or supervisors.[4] Plaintiffs allege that the new policy places undue hardship on them, and violates the FDA regulations as

---

**4.** Before filing this suit, plaintiffs filed complaints against the Clinic with the FDA, NYD-SAS, and the New York State Department of Health. According to the defendants, these administrative complaints allege many of the same improprieties at issue in this case. Benton Aff. ¶¶ 51, 53. To the best of this court's knowledge, none of the administrative complaints have been resolved.

well as state statutory, regulatory, and common law.

The Complaint states nineteen (19) causes of action, which can best be summarized in the following five categories:

1. Violation of FDA regulations concerning administration of methadone on a take-home basis;
2. Violation of federal and New York State statutes governing treatment of handicapped persons;
3. Violation of NYDSAS regulations governing methadone administration;
4. Breach of contract; and
5. Negligence.

Plaintiffs primarily seek an order compelling defendants to restore administration of methadone treatment on a take-home basis, as it existed immediately prior to August 30, 1991. Some of the plaintiffs also seek compensation for monetary loss incurred as a result of the defendant's alleged wrongdoing.

As mentioned above, the case is now before the court on plaintiffs' motion for a preliminary injunction to mandate the Clinic to restore plaintiffs to their take-home treatment status as it existed prior to August 30, 1991.

## II. DISCUSSION

■ On January 24, 1992, the court heard oral argument on plaintiffs' motion for a preliminary injunction. At the time, the court expressed doubts as to whether it has jurisdiction to adjudicate over plaintiffs' case.[5] As the parties are well-aware, federal courts are of limited jurisdiction; they are powerless to act without a specific grant of jurisdiction. *See, e.g. Bender v. Williamsport Area School Distr.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1330, 89 L.Ed.2d 501 (1986); *Employers Ins. of Wausau v.*

*Crown Cork & Seal Co.,* 905 F.2d 42, 45 (3d Cir.1990). "Where a federal court proceeds in a matter without first establishing that the dispute is within the province of controversies assigned to it by the Constitution and statute, the federal court poaches upon territory of a coordinate judicial system, and its decisions, opinions and orders are of no effect." *B. Inc. v. Miller Brewing Co.,* 663 F.2d 545, 548 (5th Cir. 1981). Therefore, before reaching the substance of plaintiffs' motion for a preliminary injunction, the court must ensure that it has jurisdiction to adjudicate over the subject matter of this case. *Employers Ins.,* 905 F.2d at 45; *MCG, Inc. v. Great Western Energy Corp.,* 896 F.2d 170, 173 (5th Cir.1990); *Latin Am. Prop. & Cas. v. Hi–Lift Marina,* 887 F.2d 1477, 1479 (11th Cir.1989).[6]

■ The burden rests with the plaintiffs to satisfy the court of its jurisdiction to adjudicate over their case. *E.g. Newhard, Cook & Co. v. Inspired Life Centers, Inc.,* 895 F.2d 1226, 1228 (8th Cir.1990). Plaintiffs assert two bases providing this court with subject matter jurisdiction: diversity of citizenship, pursuant to 28 U.S.C. § 1332 (1988 & West Supp.1991), and existence of a claim arising under federal law, pursuant to 28 U.S.C. § 1331 (1988). The court will examine plaintiff's purported bases for subject matter jurisdiction *seriatim.*

### A. Diversity of Citizenship

■ In ¶ 2 of their complaint, plaintiffs allege that, "[w]ith respect to plaintiffs Lawrence Cushing and Alan Howard, diversity of citizenship pursuant to 28 U.S.C. § 1331 [*sic*], exists among the diverse parties, and the matter in controversy, exclusive of interest and costs, exceeds the sum of $50,000." Complaint ¶ 2.[7] Plaintiffs pursued this point at oral argument, sug-

---

5. The court originally expressed its doubts at the January 16, 1992 oral argument on plaintiff's unsuccessful motion for a temporary restraining order. Counsel for all parties were present at that argument, and were therefore placed on notice as to the court's concern. At the court's request, both parties have submitted memoranda of law on the question of jurisdiction.

6. In fact, this court recently dismissed a case *sua sponte* at the preliminary injunction stage, for want of subject matter jurisdiction. *McRae v. Sweet,* 1991 WL 274261 (1991) (McCurn, C.J.).

7. One can safely assume that plaintiffs meant to allege diversity of citizenship pursuant to 28 U.S.C. § 1332, and not § 1331.

gesting that Cushing's and Howard's "diverse status" confers subject matter jurisdiction upon the court with respect to Cushing's and Howard's claims against the defendants. Plaintiffs conceded that none of the other plaintiffs claim jurisdiction by way of the diversity statute.

It is immediately clear that plaintiffs are incorrect in their assertion of jurisdiction by means of diversity of citizenship, even for just those two plaintiffs who satisfy the criteria of § 1332. The diversity statute § 1332 requires *complete* diversity. The requirement of complete diversity of citizenship mandates that *each* plaintiff meet the diversity requirements as to *each* defendant. *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 109 S.Ct. 2218, 2221, 104 L.Ed.2d 893 (1989); *Employers Ins.,* 905 F.2d at 45. "It is well established that diversity jurisdiction attaches only when all parties on one side of the litigation are of a different citizenship from all of those on the other." *Stouffer Corp. v. Breckenridge,* 859 F.2d 75, 76 (8th Cir. 1988) (citing *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806)).

██ Complete diversity of citizenship clearly does not exist in this case. All of the defendants are alleged to be residents of New York State. Therefore, complete diversity would exist only if all of the plaintiffs reside in states other than New York. While it is true that three of the plaintiffs reside outside of New York State, six of the plaintiffs—by plaintiffs' own admission—reside within New York State. *See* Complaint ¶¶ 5–9. Those six plaintiffs' New York residency destroys complete diversity of citizenship for purposes of subject matter jurisdiction. *See Cabalceta v. Standard Fruit Co.,* 883 F.2d 1553, 1557 (11th Cir.1989); *Freeman v. Northwest Acceptance Corp.,* 754 F.2d 553, 555 (5th Cir. 1985).

Plaintiffs presumably ask the court to consider jurisdiction only as it relates to the diverse plaintiffs, *i.e.* Cushing and Howard. This the court cannot do. The diversity statute is clear: "[i]f the case involves more than one plaintiff and more than one defendant, the court must be certain that *all* plaintiffs have a different citizenship from all defendants." *Getty Oil, Div. of Texaco v. Insurance Co. of N. Amer.,* 841 F.2d 1254, 1258 (5th Cir.1988) (emphasis added) (citation omitted); *accord Depex Reina 9 P'ship v. Texas Int'l Petroleum,* 897 F.2d 461, 463 (10th Cir.1990). The rule requires the court to look at "the civil action." 28 U.S.C. § 1332; *see Getty Oil,* 841 F.2d at 1258 ("the case"). The court cannot sever, or otherwise avoid looking at, the entire case; the presence of some plaintiffs who share citizenship with some defendants destroys complete diversity of citizenship. *E.g. id.; Cabalceta,* 883 F.2d at 1557; *Freeman v. Northwest Acceptance Corp.,* 754 F.2d 553, 555.[8]

In sum, the presence of six plaintiffs with New York residency destroys complete diversity of citizenship for purposes of subject matter jurisdiction. Accordingly, diversity of citizenship does not provide a basis for this court's jurisdiction over the subject matter. *Employers Ins.,* 905 F.2d at 45.

### B. Claims Arising Under Federal Law

Plaintiffs urge that the court also has jurisdiction pursuant to 28 U.S.C. § 1331, in that their complaint presents causes of action arising under the laws of the United States.[9] Indeed, plaintiff has stated causes of action which, if legitimate, arise under federal laws and regulations. Specifically, as noted *supra,* plaintiffs allege that Whitney Young's enforcement of its new take-home policy violates (1) section 504 of the

---

**8.** Of course, the truly diverse plaintiffs could initiate a separate action in this court based upon complete diversity of citizenship. The presence of even one New York plaintiff, however, defeats jurisdiction based upon diversity of citizenship. 28 U.S.C. § 1332.

**9.** Assuming the presence of a claim arising under the laws of the United States, and thus

cognizable under § 1331, the court would have jurisdiction over all other claims arising out of the same transactions and occurrences, pursuant to the new Supplemental Jurisdiction statute, 28 U.S.C. § 1367 (West Supp.1991). *See Lent v. Mills,* 1991 WL 239944 (N.D.N.Y.1991) (McCurn, C.J.).

Rehabilitation Act of 1973, *codified at* 29 U.S.C. § 794 (West Supp.1991) (the "Act"), as for plaintiffs Belser, Howard, Allegra, Krzemenski, and Gamari, and (2) FDA regulations governing administration of methadone treatment, *codified at* 29 C.F.R. § 291.505 (1991).

Plaintiffs' mere statement of a federal cause of action is not necessarily enough to invoke this court's jurisdiction through § 1331. The Supreme Court has instructed that the inquiry into subject matter jurisdiction does not end with the presence of a claim purporting to arise under federal law. As this court noted in *McRae*, "[a] claim that is purportedly based upon federal law should nonetheless be dismissed for want of subject matter jurisdiction if it is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy within the jurisdiction of the District Court....' " *McRae*, 1991 WL 274261 (quoting *Oneida Indian Nation of New York v. County of Oneida*, 414 U.S. 661, 666, 94 S.Ct. 772, 776, 39 L.Ed.2d 73 (1974)). *See Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 100 (2d Cir.1990); *Giulini v. Blessing*, 654 F.2d 189, 192 (2d Cir.1981) ("For jurisdictional purposes, the test is whether the complaint on its face, without resort to extraneous matter, is so plainly insubstantial as to be devoid of any merits and thus not presenting any issue worthy of adjudication"). This court takes the *Oneida Indian Nation* and *Giulini* standards to mean, at minimum, that a federal claim should be dismissed if it is obvious from the face of the complaint that plaintiff would not be able to withstand an imminent motion to dismiss pursuant to Fed. R.Civ.P. 12(b).

Defendants argue that plaintiffs' purported federal causes of action herein fall into the category of being so "devoid of merit" that they do not actually confer subject matter jurisdiction upon the court. The bases for defendants' argument are

two-fold. With respect to plaintiffs' Rehabilitation Act claims, defendants argue that plaintiffs have not stated a claim upon which relief can be granted. With respect to plaintiffs' causes of action under the FDA regulations, defendants contend that plaintiffs cannot maintain a suit thereunder because the regulations are administrative in nature, and therefore do not allow for a private cause of action.

In so arguing, defendants have presented a serious challenge to this court's authority to consider plaintiffs' motion for a preliminary injunction. Therefore, the court must carefully consider whether plaintiffs' federal causes of action are sufficient to confer subject matter jurisdiction upon the court.

1. Plaintiffs' claims under the Rehabilitation Act of 1973.

 In their third cause of action, plaintiffs Belser, Howard, Allegra, Krzemenski, and Gamari allege that the Clinic's decision to terminate their take-home methadone treatment violates section 504 of the Act, 29 U.S.C. § 794. Section 504 states, in pertinent part, that "[n]o otherwise qualified individual with handicaps in the United States ... shall, solely by reason of her or his handicap, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794 (West Supp.1991).

Even if the five plaintiffs asserting this cause of action are handicapped within the meaning of the § 504,[10] plaintiffs still run into an insurmountable barrier in pursuing this cause of action. Plaintiffs' trouble stems from the fact that the Act only prohibits discrimination that is based *solely* on the basis of handicap. *See id.* That is to say, if plaintiffs allege discrimination on a basis which turns on characteristics other than handicap, then they have not stated a cause of action recoverable under § 504 of

---

**10.** Defendants contend that not all five of the plaintiffs alleging a § 504 violation fall within the Act's definition of "individuals with handicaps," 29 U.S.C. § 706(8) (West Supp.1991). De-

fendants' contention presents a factual dispute, the resolution of which is unnecessary to the present inquiry into jurisdiction.

the Act. Although there is surprisingly little case law exploring this element in any detail, those courts having spoken on the issue have ruled that a plaintiff cannot prevail on a claim brought under the Act without showing that his handicap was the *sole* basis for the alleged discrimination. *See Norcross v. Sneed,* 755 F.2d 113, 117 n. 5 (8th Cir.1985); *Lunceford v. District of Columbia Bd. of Educ.,* 745 F.2d 1577, 1580 (D.C.Cir.1984); *Bernard B. v. Blue Cross and Blue Shield of Greater New York,* 528 F.Supp. 125, 132 (S.D.N.Y.1981), *aff'd,* 679 F.2d 7 (2d Cir.1982); *see also Assa'ad–Faltas v. Commonwealth of Virginia,* 738 F.Supp. 982, 987 (E.D.Va.), *aff'd mem.,* 902 F.2d 1564 (4th Cir.1990).

Contrary to their counsel's suggestion at oral argument, it is plain from the face of their complaint that plaintiffs have not alleged that their handicap condition formed the *sole* basis for the Clinic's decision to revoke their take-home treatment privileges. Rather, through their Complaint, specifically ¶¶ 38–39, 46–47, 83 & exh. "B", plaintiffs allege that their take-home privileges were terminated because they are *unemployed,* and that they are unemployed because they are handicapped. Plaintiffs' concession that their unemployed status was a determinative factor in the Clinic's alleged discriminatory treatment of them is fatal to their case. Once plaintiffs alleged that another factor, their unemployed status, formed the basis of the Clinic's decision to terminate their take-home treatment, plaintiffs could no longer argue that their handicap formed the *sole* basis for the Clinic's alleged discriminatory treatment.

To better illustrate why plaintiffs' Rehabilitation Act claim is flawed, the court notes plaintiffs' allegation that the Clinic's policy at issue lists unemployment, but not handicap, as a circumstance mandating revocation of take-home methadone treatment. *See* Complaint exh. "B". It is entirely possible, therefore, that a handicapped patient *can* receive methadone treatment on a take-home basis, so long as the handicapped individual is also employed and meets all of the other eligibility requirements. Since, under the allegations set forth in plaintiffs' complaint, handicapped patients may be entitled to methadone treatment on a take-home basis, plaintiffs cannot logically contend that the Clinic discriminates solely on the basis of handicap.

It is clear from plaintiffs' complaint that the Clinic discontinued their take-home treatment because plaintiffs were unemployed. The Clinic's decision in this respect may have been unfair; it may even have been negligent. Those issues are not now before this court. For purposes of this discussion, the court is compelled to conclude that the Clinic did not discriminate, or otherwise deprive plaintiffs of certain benefits, solely on the basis of plaintiffs' handicap. Therefore, plaintiffs have not stated a claim under the Act upon which relief can be granted. *See* 29 U.S.C. § 794; Fed. R.Civ.P. 12(b)(6).

2. Plaintiffs' claims under the FDA regulations.

In light of the foregoing discussion, plaintiffs' only remaining basis for invoking federal court jurisdiction rests in their claims that defendants violated several requirements of the FDA regulations. In a nutshell, plaintiffs allege that the Clinic acted unreasonably in enacting the new take-home policy and failed to make treatment decisions based upon individualized medical judgment, in violation of numerous sections of the regulations.

Without conceding to having violated any of the FDA regulations, defendants contend that plaintiffs have not stated a claim upon which relief can be granted. Specifically, defendants allege that the FDA regulations cited by plaintiff are regulatory, or administrative, in nature, and as such are not meant to provide the basis of a right to assert a private cause of action for violations thereof. Since the FDA regulations do not allow for a private cause of action, argue defendants, plaintiffs cannot maintain this suit thereunder.

Defendants correctly assert that not all laws allow for a private right of action. The Supreme Court has written that "the fact that a federal statute has been violat-

ed and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1951, 60 L.Ed.2d 560 (1979), *quoted in, e.g., Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). Rather, the right of a private citizen (as opposed to just an administrative agency) to bring suit under a given statute must be either specifically created in the statute, or else implied from the terms of the statute. *E.g. id.; Siebert v. Conservative Party of New York State*, 724 F.2d 334, 337 (2d Cir.1983), *cert. denied*, 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984).

At oral argument, plaintiffs' counsel readily acknowledged that neither the FDA regulations nor the regulations' enabling legislation expressly creates a private cause of action for violations. Therefore, the court is left to determine whether the regulations implicitly create a private cause of action.

Whether a private cause of action exists depends entirely on whether Congress intended to create a private remedy. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *California v. Sierra Club*, 451 U.S. 287, 293, 101 S.Ct. 1775, 1778, 68 L.Ed.2d 101 (1981); *Pryor v. United States Steel Corp.*, 794 F.2d 52, 57 (2d Cir.), *cert. denied*, 479 U.S. 954, 107 S.Ct. 445, 93 L.Ed.2d 393 (1986). In *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), the Supreme Court identified four factors which are relevant to consideration of Congressional intent.[11] It is important, however, that the court not be weighed down in the *Cort* factors. "[W]hile [the *Cort* ] factors remain relevant, the central inquiry must be whether Congress intended to create a private cause

of action." *Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 311 (2d Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *see Pryor*, 794 F.2d at 57 (" 'the Supreme Court [has] compressed the *Cort* test to a consideration solely of legislative intent' ") (citation omitted). Thus, the court must attempt to discern whether Congress intended to create a private cause of action under the FDA regulations.

For the reasons discussed *infra*, the court can comfortably conclude that neither Congress nor the FDA intended to benefit methadone patients, such as the plaintiffs, when they promulgated the current FDA regulations. That is to say, the regulations were not intended for the "especial benefit" of the plaintiffs. *See Cort*, 422 U.S. at 78, 95 S.Ct. at 2087. The fact that the regulations were not enacted for these plaintiffs' benefit is probative of Congress's intent because it indicates that Congress did not intend for this class of plaintiffs to be protected by the regulations. The argument runs that if Congress did not intend for these plaintiffs to be protected by the regulations, then Congress did not intend to allow plaintiffs to sue to enforce the regulations' terms. *See, e.g., Sierra Club*, 451 U.S. at 293, 101 S.Ct. at 1778; *Pryor*, 794 F.2d at 57; *Siebert*, 724 F.2d at 337.

Congress's (and the FDA's) intent in this respect is apparent from the purpose of the regulations. The FDA regulations were designed to protect the general public from the misuse and abuse of methadone that can occur with the legalized use of such a highly addictive drug. The purpose behind the FDA regulations, in other words, centers on drug prevention and enforcement, and not medical treatment for recovering addicts. To be sure, the regulations state

---

**11.** The Court delineated the four factors as follows:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create a remedy or to deny one? Third, is it consistent with the

underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort*, 422 U.S. at 78, 95 S.Ct. at 2087 (citations omitted).

that they were enacted in response to concerns about the "number of dangers and possible abuses [which] may arise from [use of methadone as a treatment for prolonged narcotic dependence] if professional services and controls are inadequately applied." 21 C.F.R. § 291.501(a). Since the regulations were not intended to benefit the plaintiffs, plaintiffs' suit to enforce the terms—and presumably to benefit therefrom—seems contrary to Congressional intent.

The legislative history behind the enabling legislation supports the view that the FDA regulations were enacted to benefit (and protect) the general public, as opposed to this class of plaintiffs. The parties do not agree on exactly which statute is the enabling legislation for the FDA regulations. The Second Circuit resolved the dispute, however, in *Luna v. Harris*, 888 F.2d 949, 953–54 (2d Cir.1989). The enabling legislation, according to *Luna*, actually consists of two Congressional acts: the Comprehensive Drug Abuse Prevention and Control Act, 42 U.S.C. § 257a (1982) ("the 1970 Act"), and the Narcotic Addict Treatment Act of 1974, 21 U.S.C. § 823(g) (1982) (the "1974 Act"). *Luna*, 888 F.2d at 953 ("Pursuant to this authority, the FDA ... has promulgated regulatory guidelines for the establishment and operation of methadone treatment programs for narcotics addicts") (citing the FDA regulations). In fact, the regulations explicitly state that the conditions set forth therein for the administration of methadone treatment are promulgated pursuant to section 4 of the Comprehensive Drug Abuse Prevention Act of 1970. 21 C.F.R. § 291.505.

The legislative history of the 1970 Act states that the purpose of that Act is to promote "increased efforts in drug abuse prevention and rehabilitation," "more effective means for law enforcement aspects of drug abuse prevention and control," and "an overall balanced scheme of criminal penalties for offenses involving drugs." H.R.Rep. No. 91–1444, 91st Cong., 2d Sess. 1444, *reprinted in* 1970 U.S.Code Cong. & Admin.News 4566, 4567, *quoted in* Def. Supp. Brief (1/23/92), at 2. In *Luna*, the Second Circuit provided insight into the

interplay between the 1970 Act and its "supplement", the 1974 Act, when it wrote:

> The passage of the 1970 Act resulted in a substantial increase in the number of methadone treatment clinics nationwide. As a result, the risk of illegal diversion of methadone increased. The 1974 Act was passed primarily to respond to this problem. Its chief purpose was "to curb the diversion and abuse of narcotic drugs used in the treatment of narcotic addicts." Congress found that "the use of methadone in the treatment of heroin addiction involves unique and unusually great risks of diversion and criminal profiteering," and noted that a frequent source of illicit methadone was diversion by addicts abusing take-home privileges. The 1974 Act was accordingly designed to "permit flexibility in treatment, while requiring adequate accountability for narcotic drugs administered in that treatment. It ... provide[s] a statutory complement to the FDA regulations, and provide[s] more specific controls over diversion."

*Id.* at 954 (citations omitted).

The effect of the legislative history behind these enabling statutes was the promulgation of the FDA regulations. Pursuant to their objectives, the regulations recognize that methadone use has shown promise in the treatment of narcotic addictions, but also recognize the need to protect the general public from the dangers of legalized methadone use. 29 C.F.R. § 291.501(a), (b).

In accordance with their objectives, the regulations are restrictive, not expansive, in nature with respect to administration of methadone treatment. In other words, the regulations limit the extent to which methadone treatment can be administered. The most pertinent example of the restrictive nature of the regulations is found in the provision governing take-home medication, wherein the regulations state, "[t]ake-home medication may be given *only* to a patient who, in the reasonable judgment of the program physician, is responsible in handling narcotic drugs." 29 C.F.R. § 291.505(d)(6)(iv)(A) (emphasis add-

ed). That same provision limits the ability of a Clinic to administer methadone treatment on a take-home basis in several other respects, as well. *See id. See also, e.g.,* 29 C.F.R. § 291.505(b)(2)(i) ("[b]efore a narcotic treatment program may be lawfully operated, the program ... shall submit [certain applications] and must receive approval...."); *id.* § 291.505(b)(2)(iv) (program must be approved before administering methadone); *id.* § 291.505(b)(3)(v) (program must be administered in accordance with regulations). All of these restrictions on methadone distribution corroborate the notion that the regulations are intended to benefit not the plaintiffs but the general public, by protecting it from the trouble inherent with treating heroin addiction with methadone.

The finding that the FDA regulations were not intended to benefit these plaintiffs is buttressed by the fact that the regulations do not create a *right* in the plaintiffs to receive methadone. The regulations explicitly state as much in the provision governing gradual implementation of take-home treatment:

> *(v) Take-home requirements.* The requirement of time in treatment is a minimum reference point after which a patient may be eligible for take-home privileges. *The time reference is not intended to mean that a patient in treatment for a particular time has a specific right to take-home medication.* Thus,

regardless of time in treatment, a program physician may, in his or her reasonable judgment, deny or rescind the take-home medication of a patient.

21 C.F.R. § 291.505(d)(6)(v) (emphasis in original of heading; emphasis added to text). *See Transamerica Mortgage Advisors, Inc.,* 444 U.S. at 16, 100 S.Ct. at 245 (court must afford substantial weight to the express terms of the regulations); *Touche Ross & Co.,* 442 U.S. at 568, 99 S.Ct. at 2485 (same). If plaintiffs do not have a right to receive take-home methadone treatment, it is difficult to imagine how they can argue that they have a right to sue to receive take-home methadone treatment. The argument is contrary to the express terms of the regulation.

The provision stating that "a program physician may, in his or her reasonable judgment, deny or rescind the take-home privileges of a patient," 29 C.F.R. § 291.505(d)(6)(v), is telling in this respect, as well. The fact that a doctor has virtually unfettered discretion—so long as he or she acts reasonably—to terminate a patient's take-home treatment precludes any argument that a patient has a right to have the doctor administer methadone to him on a take-home basis. The reality is that plaintiffs can point to no language in the regulations providing even an insinuation that a patient is entitled to methadone treatment at all, let alone on a take-home basis.[12]

---

12. Plaintiffs' counsel presented a profound point at oral argument with respect to *Luna v. Harris.* In *Luna,* the plaintiff argued that the NYDSAS take-home provisions are preempted by the FDA regulations. The district court characterized that plaintiff's action as a § 1983 action. *Luna,* 666 F.Supp. 33, 33 (E.D.N.Y.1987). The Second Circuit affirmed the district court's decision. 888 F.2d 949.

Plaintiffs' counsel here suggested that *Luna* implicitly supports the view that the FDA regulations create a private right of action, because of the district court's characterization of the action as a § 1983 action. An element of a § 1983 action is the deprivation of a right secured by the laws and regulations of the United States. *See* 42 U.S.C. § 1983 (1988); *see also, e.g., Kessler v. Town of Niskayuna,* 1991 WL 278788 (N.D.N.Y.1991) (McCurn, C.J.). Therefore, in order to have maintained her § 1983 action, the plaintiff in *Luna* had to establish that she was deprived of a right protected by the

FDA regulations. In other words, the court in *Luna* had to presume that the FDA regulations created rights which could be deprived. Since the FDA regulations create rights in plaintiffs, the plaintiffs should be allowed to sue to enforce their rights.

While plaintiffs' argument is well taken, it is not compelling. Unlike in the present case, the defendant in *Luna* did not raise the issue of whether plaintiff's action therein was properly asserted under § 1983. Therefore, the Second Circuit dealt only with the question of preemption, and provided no insight into whether plaintiff's suit was properly asserted under § 1983. To the extent that the district court in *Luna* stated that plaintiff's action was cognizable under § 1983, this court respectfully disagrees. For the reasons set forth herein, the FDA regulations do *not* create rights in these plaintiffs. Since plaintiffs cannot allege a deprivation of rights secured by the regulations, they

Given the broad discretion afforded to the program physician to terminate take-home treatment, plaintiffs cannot reasonably argue that they have a right to take methadone on a take-home basis. That the regulation does not create a right to take-home treatment lends credence to the conclusion that the regulation was not intended for the especial benefit of these plaintiffs. And, as stated at numerous points *supra,* if the regulations were not intended for the especial benefit of the plaintiffs, then the court can assume that Congress did not intend to allow these plaintiffs to benefit from the regulations through a lawsuit.

Finally, the court is persuaded that the *"Sanctions"* provision of the regulations exhibits the FDA's intent to preclude a private right of enforcement. In 21 C.F.R. § 291.505(i), the regulations set forth four sanctions which might be imposed against the Clinic in the event that the Clinic fails to abide by all of the requirements of the regulations.[13] The available sanctions include revocation of FDA approval, seizure of drug supplies, injunction, and criminal prosecution. *Id.* Conspicuously absent from this list is a threat of "civil action" or the like. The FDA's refusal to include "civil action" as an enforcement mechanism is significant when considered in light of the presence of alternative enforcement schemes. The Supreme Court articulated this axiom, albeit in the context of a purported § 1983 action, when it wrote: "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Middlesex Cty. Sewerage Auth. v. National Sea Clammers,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981).

Neither the FDA regulations nor their enabling legislation provide any suggestion that Congress intended to create a private cause of action for enforcement of the regulations' terms. This in itself is telling.

*See Middlesex,* 453 U.S. at 20, 101 S.Ct. at 2626. The inference to be drawn from all of the foregoing circumstances is that the plaintiffs are not the intended beneficiaries of the FDA regulations. As such, they are not entitled to sue to enforce the regulations' terms. Any other conclusion, in this court's view, would be contrary to Congress's intent not to allow a private right of action under the regulations.

### III. CONCLUSION

This court does not have subject matter jurisdiction to adjudicate over plaintiffs' complaint. Accordingly, plaintiffs complaint must be dismissed, pursuant to Fed. R.Civ.P. 12(b)(1), for want of subject matter jurisdiction. In light of the dismissal, plaintiffs' motion for a preliminary injunction must be denied.

IT IS SO ORDERED.

---

cannot maintain an action under § 1983. *See Kessler,* 1991 WL 278788.

**13.** Plaintiffs counsel's suggestion at oral argument that the sanctions provision applies only to certain immaterial parts of the regulations is

incorrect. By its express terms, the section applies to failure "to abide by *all requirements set forth in this regulation....*" 29 C.F.R. § 291.505(i).