**Robert O'MALLEY, Gary Leibowitz, and Looker's, Inc., Plaintiffs,**

**v.**

**The CITY OF SYRACUSE, Thomas Young, C. Frank Harrigan, and Charles Ladd, Defendants.**

**No. 93–CV–89.**

United States District Court, N.D. New York.

Feb. 11, 1993.

Joseph Siracusa, Syracuse, NY, for plaintiffs.

C. Frank Harrigan, Corp. Counsel, City of Syracuse, Syracuse, NY (Susan Finkelstein, James L. Jarvis, of counsel), for defendants.

MEMORANDUM–DECISION
AND ORDER

MUNSON, Senior District Judge.

This highly publicized dispute needs little in the way of introduction. On the surface, at issue is plaintiffs' desire to operate within the City of Syracuse a club that features nude and topless dancers. Upon stripping away the layers, however, one is exposed to a controversy that is hardly skin deep. The court is faced with two conflicting interests which through the years have helped to develop the body of our constitutional jurisprudence.

On the one hand is a community's well-established interests in protecting order and morality, preserving the quality of urban life, promoting retail trade, maintaining property values, and preventing urban blight. All of these interests are recognized as desirable objectives of a democratic government in a civilized society. *See, e.g., Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 61, 93 S.Ct. 2628, 2637, 37 L.Ed.2d 446 (1973). So firmly entrenched is the legitimacy of the government's interest in promoting these societal objectives that it needs no elucidation here. *See, e.g., Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 805, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984) (citing cases).

On the other hand is an individual's right to express himself without oppression from the democracy's majoritarian process. The First Amendment protects the expression of ideas, especially unpopular ideas, as well as the means by which the speaker chooses to convey those ideas. *See, e.g., Texas v. Johnson,* 491 U.S. 397, 404 & 414, 109 S.Ct. 2533, 2539 & 2544, 105 L.Ed.2d 342 (1989); *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 55–56, 108 S.Ct. 876, 881–82, 99 L.Ed.2d 41 (1988); *Federal Communications Comm'n v. Pacifica Foundation,* 438 U.S. 726, 745–46, 98 S.Ct. 3026, 3038–39, 57 L.Ed.2d 1073 (1978). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive...." *Johnson,* 491 U.S. at 414, 109 S.Ct. at 2544 (citations omitted); *accord, e.g., Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 1365, 22 L.Ed.2d 572 (1969). The fact that the expression is not in the form of "speech" is irrelevant. It is now settled, for example, that performances in theatres are entitled to First Amendment protection even though they do not fit squarely into the traditional, everyday definition of speech, because such performances "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression." *California v. La Rue,* 409 U.S. 109, 129, 93 S.Ct. 390, 403, 34 L.Ed.2d 342 (1972) (Marshall, J., dissenting); *see also, e.g., Johnson,* 491 U.S. at 404–06, 109 S.Ct. at 2539–40 (First Amendment protection is not limited to the spoken word but extends to the expression of ideas) (citations omitted). The expression at issue in this case is nude and/or topless dancing, an activity which the Supreme Court has repeatedly recognized as "expressive conduct" within the scope of the First Amendment. *See generally Barnes v. Glen Theatre, Inc.,* —— U.S. ——, ——, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504 (1991); *Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981); *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975); *La Rue,* 409 U.S. at 118, 93 S.Ct. at 397.

Often times, as in the present case, an individual's interest in freedom of expression clashes with the government's interest in societal order so directly that the two positions are irreconcilable. In these cases, one interest must give way to the other. *E.g. International Soc'y for Krishna Consciousness, Inc. v. Barber,* 506 F.Supp. 147, 148–49 (N.D.N.Y.1980), *rev'd on other grounds,* 650 F.2d 430 (2d Cir.1981). The instant proceeding presents the court with the daunting task of balancing these impor-

tant but competing interests to determine which must give way.

Plaintiffs Robert O'Malley and Gary Leibowitz own and operate Looker's, Inc., an establishment at which they would like to feature dancers who perform "all nude, all the time." When they learned of the City's imminent plans to rely upon various ordinances to close Looker's and prosecute performers and/or operators, plaintiffs brought this action seeking, *inter alia*, to enjoin the City taking such action. Plaintiffs allege that the City's enforcement of its ordinances would violate their First Amendment right to free expression and their Fourteenth Amendment right to equal protection under the law.[1]

Along with their complaint, filed on January 19, 1993, plaintiffs submitted an application for a temporary restraining order to enjoin the City from enforcing its ordinances. This court heard oral argument and received supplemental briefing from both parties regarding plaintiffs' application, after which it entered a temporary restraining order enjoining the City from enforcing one of its ordinances, Chapter 44 of the Revised General Ordinances (hereinafter "Chapter 44"). The court denied plaintiffs' application for an order temporarily restraining the City from enforcing another ordinance, section 5–11 of the Revised General Ordinances (hereinafter "section 5–11").

Pursuant to Fed.R.Civ.P. 65, the court subsequently conducted an evidentiary hearing to determine whether it should (1) convert the temporary restraining order into a preliminary injunction, (2) vacate the temporary restraining order altogether, and/or (3) issue a preliminary injunction with respect to the City's enforcement of section 5–11. Having considered the evidence and counsels' arguments regarding further preliminary relief in this action, the court now issues the following findings pursuant to Rule 65.[2]

## I. BACKGROUND

On November 4, 1992, plaintiffs O'Malley and Leibowitz leased a building at 1400 North Salina Street for use as a "restaurant and showclub." They subsequently acquired various permits and licenses which they believed would allow them to operate their new facility. Most notably, on December 30, 1992, plaintiffs obtained from the City a license "to carry on the business of Dance, Floor Show or Entertainment at Looker's, Inc., 1400 N. Salina St., Syracuse, NY." Neither the application nor the license designates the particular type of dance, floor show, or entertainment that might take place at Looker's. License in hand, plaintiffs planned to open their new club to the public in early January, 1993, as a showcase for nude dancers.

Unfortunately for plaintiffs, their plan did not run as smoothly as expected. Plaintiffs blame the City for placing numerous unconstitutional barriers in their path which prevented them from exercising their right to operate Looker's as planned. Specifically, the City threatened to enforce two ordinances—section 5–11 and Chapter 44—which would have had the effect of prohibiting nude and topless dancing at Looker's. The City amended Chapter 44 just hours before the scheduled opening of

---

**1.** Given the wholly prospective nature of the relief that plaintiffs seek here, this court *sua sponte* expressed its concern at an earlier proceeding concerning its jurisdiction, specifically with regard to standing and ripeness. *See Cushing v. Moore*, 783 F.Supp. 727, 732 (N.D.N.Y.), *aff'd in part and remanded in part on other grounds*, 970 F.2d 1103 (2d Cir.1992) (court is obligated to ensure that it has jurisdiction and must dismiss the case outright if jurisdiction is lacking). The parties responded orally and in writing to the court's concern, with the Assistant Corporation Counsel asserting that the City intends to immediately prosecute these particular plaintiffs and close down their establishment if

they violate the City's anti-nudity ordinances. This representation satisfied the court that plaintiffs have standing to maintain this suit and that the dispute is ripe for review. *See, e.g., Bordell v. General Electric Co.*, 922 F.2d 1057 (2d Cir.1991); *Carlin Communications, Inc. v. F.C.C.*, 749 F.2d 113, 123 & n. 20 (2d Cir.1984) (citations omitted).

**2.** The parties have declined to convert this proceeding pursuant to Rule 65 into a hearing on the merits. For purposes of this hearing, the parties have agreed to incorporate all affidavits and accompanying exhibits into the record.

Looker's, and has readily acknowledged its intent to enforce both ordinances against Looker's in the future. Plaintiffs contend that both ordinances are overly broad in their sweep, in that they chill more expression than necessary, in violation of the First Amendment. Plaintiffs also argue that the City impermissibly amended Chapter 44 with an eye toward Looker's, and directed enforcement of its zoning ordinances and permit requirements against Looker's in particular. This selective enactment and enforcement of laws, argue plaintiffs, violates the equal protection clause of the fourteenth amendment.

### A. Enactment of amendments to Chapter 44

Neighbors and public officials apparently first learned of plaintiffs' plan to feature nude dancers in late December, 1992 and early January, 1993, mostly through publicity in which plaintiffs advertised Looker's as being "all nude, all the time." Defendant Charles Ladd, a City Planner and member of the City Planning Commission, was seemingly among the first public officials to learn about the proposed nude dancing at Looker's. Ladd testified that he learned of plaintiffs' plans for Looker's on December 23, 1992, when an anonymous "concerned resident" informed him of the possibility that a topless bar might be opening at that location. *See* Ladd Aff. (1/29/93) ¶ 22 & exh. "E". Later that day, plaintiff Leibowitz contacted Ladd concerning an unrelated matter and during the conversation confirmed that he intended to feature "live adult entertainment" at the establishment. *Id.* ¶ 25.

Two members of the City's Common Council, Frederick Guy and Nancy McCarty, both offered uncontradicted testimony that they had not even heard of Looker's until early January, 1993, when they received complaints from constituents concerning the possible opening of a "strip joint" on the City's North Side. As will become apparent *infra*, the early January, 1993 "discovery date" by Councilors Guy

and McCarty of the proposed nude dancing at Looker's is significant because by that date, they had already co-sponsored in the Common Council the legislation which ultimately amended Chapter 44. The amended Chapter 44 outlaws operation of "adult entertainment businesses" within 1,000 feet of, *inter alia*, residences, religious institutions, schools, and public parks.[3] The ordinance defines an "adult entertainment business" as being, in pertinent part, "a public establishment which features topless dancers, nude dancers or strippers, male or female." Both councilors testified in detail that they sponsored the legislation before learning of plaintiffs' plans concerning Looker's. In fact, Councilor Guy first proposed the legislation in October, 1992, and Councilor McCarty joined in sponsorship on December 23, 1992. Significantly, this marked the second occasion on which Councilor Guy sponsored such legislation. He proposed similar legislation in March, 1992, but that measure was soundly defeated.

Noting the importance of the chronology of events giving rise to this litigation, the City has offered extensive proof concerning the actions of various City officials *vis-a-vis* the proposed nude dancing at Looker's. In June and August, 1992, after Councilor Guy's initial (unsuccessful) attempt to amend Chapter 44, the City received license and special permit applications from at least two other proposed "adult entertainment businesses," the first one located at 617 Wolf Street and the other at 117 Bruce Street. Neither proposed establishment had any affiliation with plaintiffs. The applicants openly notified the City Planning Commission or other City officials during these proceedings that they intended to operate establishments featuring nude or semi-nude dancing. Having no legitimate basis for denying the requests, the City's License Commissioner, Margaret Davies, approved both applications.

Then, in October, 1992, after learning about the proposed establishments at Wolf Street and Bruce Street, Councilor Guy re-

---

**3.** The amendment brought "live entertainment" within the coverage of Chapter 44. Before the amendment, Chapter 44 was limited to regulating adult bookstores.

introduced his proposal to amend Chapter 44. This time, in light of the reported plans for nude or topless entertainment at these two establishments, the Council was more receptive to amending Chapter 44. As mentioned above, Councilor McCarty co-sponsored this legislation on December 23, 1992. Both councilors testified that they and others were acutely concerned with the detrimental effects that such "adult entertainment businesses" might have on the surrounding neighborhoods. Thus, they were eager to amend Chapter 44 as quickly as possible. The resolution was placed on the Council's agenda on November 2, 1992, and then "held over" for two meetings so that the councilors could strike a compromise regarding certain details of the ordinance.[4]

The councilors apparently conducted their deliberations over Chapter 44 without knowing that on October 2, 1992, plaintiffs had filed with the City an application for an entertainment license. The Councilors had no reason to know about plaintiffs' efforts because the application was devoid of any mention that plaintiffs intended to operate an "adult entertainment business" at their premises. As mentioned above, plaintiffs received their license on December 30, 1992. Even then, however, the councilors were still unaware of plaintiffs' plans, and by then Councilor McCarty had already co-sponsored Councilor Guy's amendment to Chapter 44.

Most of the councilors became aware of plaintiffs' plans during the first week in January, 1993. At that time, constituents voiced their strong opposition to the opening of such a facility in their neighborhood. One constituent who resides near Looker's allegedly complained to Councilor Guy that she was deeply offended when a man standing near Looker's asked her whether she would be willing to perform nude at the establishment. On January 11, 1993, the Common Council approved the amendment to Chapter 44, and the mayor, defendant Young, signed the legislation into law

on January 15, 1993. Inasmuch as Looker's did not finally open until one day later, on January 16, 1993, the newly amended Chapter 44 was effective against Looker's. Moreover, the parties agree that Looker's is located within 1,000 feet of some of the premises described within Chapter 44 and hence is covered by the ordinance's regulation of adult entertainment businesses.

### B. Enforcement of ordinances

Plaintiffs argue that they would have opened Looker's sooner—indeed, they were prepared to open on January 12, 1993—but for the City's selective enforcement of its zoning ordinances. Plaintiffs contend that the City issued various "Stop Work Orders" to forestall final preparations for Lookers' opening, which in turn prevented advertising for the opening. According to plaintiffs, the City issued the Stop Work Orders so that the opening would be delayed long enough to allow for the passage of the amendment to Chapter 44.

The evidence surely suggests that some of the City's zoning practices are peculiar, to say the least. For example, the Stop Work Order about which plaintiffs complain resulted from the removal of a kitchen wall at Looker's. Plaintiffs alleged that the wall was removed so that the dining area would be larger. The City contends that the wall removal and consequent enlargement of the dining room violated the terms of Lookers' "Special Permit," in which the approved floor specifications are explicitly detailed. Although the wall was removed sometime in the Fall of 1992, the City did not discover the modification until late December, 1992. After discovering the modification, on December 31, 1992 (i.e., months after the wall was removed), the City issued to plaintiffs a Stop Work Order, directing them to refrain from removing the wall or making any other structural improvements at Looker's pending proper authorization of the work.

---

**4.** Councilor McCarty and some other councilors expressed concern that the amendment to Chapter 44, if enacted, would prohibit theatrical performances such as *Hair* and *Oh! Calcutta* in downtown theatres. Since they viewed this as an undesirable result, the councilors reworded the ordinance so that such performances would be excluded from coverage.

To have the Stop Work Order vacated (for work that was already completed), plaintiffs were required to file an application for a new special permit which authorized their removal of the wall. Plaintiffs filed their application on approximately January 4, 1992, and the order was lifted shortly thereafter. Due to the stoppage in preparations caused by the Stop Work Order, plaintiffs contend, the opening of Looker's was necessarily delayed for about one week, from approximately January 9, 1993 to January 16, 1993.

When questioned at the hearing, plaintiff Leibowitz testified that he postponed the opening of Looker's primarily because the Stop Work Order caused plaintiffs to miss the advertising deadline of a local weekly newspaper. Unable to advertise the opening of Looker's, he believed that the opening should be delayed for one week so that it could be advertised in the following week's newspaper. The evidence seems clear that, but for their lack of advertising, plaintiffs were prepared to open Looker's before the January 16, 1993 actual opening. In that regard, Robert Santucci, a sales representative for a local radio station, testified that Looker's presented a "ceremonial-opening" show for him on January 12, 1993, at which a dancer performed for him while he had a drink. Santucci's testimony supported plaintiffs' position that they were prepared to open before the Common Council's January 15, 1993 passage of the amendment to Chapter 44. The one week delay in the actual opening, however, was just long enough to allow the City to enact the amendments to Chapter 44 before the opening of Looker's.

Plaintiffs further contend that the City used its permitting process to harass plaintiffs into changing their plan to feature nude dancing at Looker's. In support of this argument, plaintiffs refer first to handwritten notes prepared by defendant Ladd in Late December, 1992, in which Ladd stated that "use of this property will have to comply literally to the plans and conditions referenced in the Special Per-

mit," and that *"[n]o changes or alterations of the plans are permitted."* Ladd Aff. exh. "G" (emphasis in original). The City's rigid enforcement of the Special Permit requirements against Looker's was so strict that plaintiffs were prohibited from even moving bookshelves or an allegedly portable stage.[5] Although plaintiffs contend that they were subject to unusually exacting enforcement of such (seemingly) trivial permit requirements, they curiously offered no evidence suggesting that other similarly situated individuals were afforded more lenient treatment.

Plaintiffs also refer to the testimony of defendant Ladd and Daniel Vaughn, the City's Director of Code Enforcement, as evidence of discriminatory enforcement. Upon learning of plaintiffs' plans, Councilor Guy allegedly consulted Ladd in an effort to determine what "procedures" might be available to prevent Looker's from opening with nude dancing. Ladd further testified, however, that his discussion with Councilor Guy took place some time after January 5, 1993, *i.e.,* after the Stop Work Order had already been issued and subsequently vacated, and that the discussion did not affect any of his (Ladd's) decisionmaking. Indeed, it appears that Ladd took no action with respect to Looker's after his conversation with Councilor Guy.

Vaughn testified that he issued the Stop Work Order on December 31, 1992, even though he knew that the removal of the kitchen wall had been completed months ago. He further testified that at the conclusion of these preliminary proceedings he plans to issue *another* Stop Work Order, this time because plaintiffs enlarged the dining area without permission. Vaughn was unable to rationally explain why plaintiffs would need a *new* permit to authorize their enlargement of the dining area when the City had already authorized the removal of the kitchen wall (which inevitably had the effect of enlarging the dining area). Plaintiffs point to this nonsensical procedure as circumstantial evidence that the

---

**5.** Whether the stage is actually portable is the subject of some controversy. Determination of whether the stage is portable, however, is imma-

terial to the resolution of the broader First Amendment issues presented.

City's claimed neutral enforcement of its zoning laws was actually a pretext to disguise its plan to prevent plaintiffs from exercising their constitutional rights.

## C. Plaintiffs' complaint

Plaintiffs assert three general bases for relief. First, they claim that section 5–11 is facially invalid because it is overly broad in violation of the First Amendment. Second, they claim that Chapter 44 (as amended) is facially invalid because it is vague, does not allow for reasonable alternative avenues for communication, and was impermissibly enacted against Looker's in particular. Plaintiffs' challenges to Chapter 44 arise under both the First Amendment and the equal protection clause of the Fourteenth Amendment. Third, plaintiffs challenge the City's enforcement of its zoning ordinances, alleging that the ordinances are being enforced in a discriminatory manner against them in violation of the equal protection clause.

## II. DISCUSSION

■ As noted at the hearing on the temporary restraining order ("TRO hearing"), plaintiffs are aware that preliminary relief of the sort they seek here is very difficult to obtain, and that it is especially difficult to obtain when the relief is sought against a governmental entity. *See Pal v. Albany County*, 1992 WL 75046, 1992 U.S.Dist. LEXIS 4763 (N.D.N.Y. Apr. 3, 1992). The court may grant preliminary relief against a governmental entity only when the moving party establishes (1) that it will suffer irreparable harm if the preliminary relief is not granted, and (2) the likelihood that it will succeed on the merits of the claims. *Plaza Health Lab., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989). This two-part test is conjunctive; plaintiffs must establish both elements in order to gain the preliminary relief they seek.

■ This court further explained that the mere fact that the City's enforcement

would deprive plaintiffs of their First Amendment right of expression would constitute a *per se* irreparable injury to plaintiffs.[6] This follows the Supreme Court's direction in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In *Elrod*, the Court instructed that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." The Second Circuit echoed this maxim in *Paulsen v. County of Nassau*, 925 F.2d 65, 68 (2d Cir.1991), ruling that even a temporary abridgment of the First Amendment right to free expression constitutes an irreparable injury. Inasmuch as the City's enforcement of its ordinances against Looker's for even one evening would result in a loss of First Amendment rights, that enforcement would *per se* constitute irreparable injury to these plaintiffs. Thus, plaintiffs have satisfied the first of the two elements of the preliminary injunction standard.

■ Having found that plaintiffs will suffer irreparable harm in the absence of preliminary relief, the court turns next to determine whether plaintiffs are likely to succeed on the merits of their challenges. Contrary to the position asserted by the City, the burden rests squarely upon the City to justify its infringement of plaintiffs' rights. This follows the general rule that once plaintiffs have shown that a regulation deprives them of a protected First Amendment interest, the burden shifts to the government to justify the infringement. The Supreme Court utilized this framework in *Schad v. Borough of Mt. Ephraim*, *supra*. In *Schad*, after reaffirming that nude dancing is expressive conduct within the scope of the First Amendment, 452 U.S. at 66, 101 S.Ct. at 2181, the Supreme Court shifted the burden to the government to justify "its substantial restriction of protected activity." *Id.* at 72, 101 S.Ct. at 2184. The Court there ultimately invalidated the anti-nudity statute because the government could not justify the infringement;

---

**6.** As mentioned above, *see supra* p. 135, that plaintiffs' conduct is protected by the First Amendment seems beyond dispute. *See generally Barnes*, —— U.S. at ——, 111 S.Ct. at 2460;

*Schad*, 452 U.S. at 66, 101 S.Ct. at 2181; *Doran*, 422 U.S. at 932, 95 S.Ct. at 2568; *La Rue*, 409 U.S. at 118, 93 S.Ct. at 397.

the fact that the government was the defendant in the action did not relieve it of its burden in this regard. *See id.; accord, e.g., Travis v. Owego–Apalachin School Dist.,* 927 F.2d 688, 694 (2d Cir.1991) (invalidating statute because defendant school district failed to justify its restriction on speech and religion). The government's burden to justify its restrictions on otherwise protected expression is implicit in virtually every challenge to such restrictions. *See, e.g., Taxpayers for Vincent,* 466 U.S. at 803 n. 22, 104 S.Ct. at 2127 n. 22, *cited in City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 496, 106 S.Ct. 2034, 2038, 90 L.Ed.2d 480 (1986). It is not unreasonable to expect that a City purporting to infringe upon an individual's First Amendment rights be prepared to defend that infringement; if the City cannot adequately justify its encroachment, then the restriction is rightfully unconstitutional. *Cf., e.g., Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 843–44, 98 S.Ct. 1535, 1543–44, 56 L.Ed.2d 1 (1978) (initial burden is on government to justify restriction; defendant then has opportunity to challenge the government's proffered justification).

Plaintiffs have challenged the constitutionality of two City ordinances and the City's enforcement of its zoning ordinances. The court will review these challenges *seriatim.*

### A. Section 5–11

■ The court addresses plaintiffs' challenge to section 5–11 first because it is their weakest challenge, and thus can be disposed of in relatively simple fashion. In short, the court stands by its finding at the TRO hearing that section 5–11 passes constitutional muster, and incorporates that finding into today's ruling.

Section 5–11 provides in pertinent part that "[n]o person shall appear within the city in a state of nudity...." According to the City, this ordinance was enacted to protect societal order and morality. The most obvious indication of this purpose is found on the face of the ordinance itself, which appears in Article 2 of the City's

General Revised Ordinances, entitled "General Provisions as to *Safety, Good Order and Decency"* (emphasis added). Based upon this reference alone one could safely assume that the ordinance was designed to protect those interests. *See Connecticut v. United States Envtl. Protection Agency,* 656 F.2d 902, 909 (2d Cir.1981) ("[w]here the text of a statute is unequivocal, there is no need to speculate as to Congress's intent in enacting it") (citations omitted).

The City's asserted purpose behind enacting and enforcing section 5–11 is significant because the Supreme Court recently recognized in a similar case that the protection of public order and morality is a permissible basis for banning all-nude entertainment throughout a city. That case, *Barnes v. Glen Theatre, Inc., supra,* involved an Indiana public indecency statute which prohibited public nudity. In *Barnes,* the Court recognized that even if totally nude *dancing* is "expressive conduct" and thus constitutes "speech" within the ambit of the First Amendment, the government may nonetheless prohibit—or at least regulate—that speech under certain circumstances. *See generally Barnes,* —— U.S. ——, 111 S.Ct. 2456. Since *Barnes* involved circumstances that are so remarkably similar to those presented in this case, this court turns to that decision for guidance in resolving the issues surrounding the validity of section 5–11.

Plaintiffs' counsel suggested for the first time during his closing remarks that section 5–11 is distinguishable from the Indiana statute in *Barnes.* Plaintiffs contend that section 5–11, unlike the Indiana statute, is overly broad. A comparison of the language of the two statutes shows that plaintiffs' argument is without merit. Section 5–11 states in pertinent part that "[n]o person shall appear within the city in a state of nudity...." The Indiana statute at issue in *Barnes* states in pertinent that "[a] person who knowingly or intentionally, in a public place ... appears in a state of nudity ... [is guilty of a crime]." While the these two statutes clearly are not identical, they are sufficiently aligned to justify

this court's reliance upon *Barnes* in reviewing plaintiffs' challenge.

· In *Barnes*, the Supreme Court ruled that the Indiana anti-nudity regulation was valid because four conditions were satisfied:

1. the regulation was within the constitutional power of the government;

2. the regulation furthered an important or substantial governmental interest;

3. the regulation was unrelated to the suppression of free expression;

4. the incidental restriction on alleged First Amendment freedoms was no greater than was essential to the furtherance of that interest.

*Barnes,* —— U.S. at ——, 111 S.Ct. at 2461 (citing *United States v. O'Brien,* 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968)).

The Court in *Barnes* applied these four conditions to Indiana's statute prohibiting nude dancing and concluded that the statute passed constitutional muster "despite its incidental limitations on some expressive activity." *Id.,* —— U.S. at ——, 111 S.Ct. at 2461. Considering these conditions in turn, the Court first found that the government's interest in protecting societal order and morality falls within the legitimate constitutional power of the government *and* furthers substantial governmental interests. *Id.* at ——, 111 S.Ct. at 2461–62. *Barnes* marked only the most recent in a line of Supreme Court opinions stating that a legislature may legitimately act to protect "the social interest in order and morality." *See, e.g., Bowers v. Hardwick,* 478 U.S. 186, 196, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986); *Paris Adult Theatre I,* 413 U.S. at 61, 93 S.Ct. at 2637.

The Court in *Barnes* next ruled that the Indiana statute was unrelated to the regulation of the otherwise protected expression. In explaining this point, the Court wrote that "[p]ublic nudity is the evil the state seeks to prevent, whether or not it is combined with expressive activity." *Barnes,* —— U.S. at ——, 111 S.Ct. at 2463. The Court found that the Indiana statute was clearly not aimed at proscribing only nude *expression.* Rather, the statute was directed toward proscribing *all* nudity in general, regardless of whether the nudity occurred in an effort to convey an expressive message. *Id.* The Court illustrated this point by analogy: the Indiana statute prohibited nude sunbathing at a beach, an activity which is arguably devoid of any cognizable expressive message, in the same terms that it prohibited nude dancing, which is arguably expressive in nature. Since the statute regulated expressive and non-expressive conduct alike, one could not rationally contend that the Indiana statute was directed toward suppressing the expressive conduct in particular. Instead, reasoned the Court, the suppression of expressive nude conduct was merely incidental to the larger purpose of the statute, to promote societal order and morality by prohibiting public nudity in general.

Finally, the Court in *Barnes* rejected the dancers' argument that the statute was not narrowly tailored to achieve its objectives. In that regard, the Court explained:

the governmental interest served by the ... prohibition is societal disapproval of nudity in public places among strangers. The statutory prohibition is not a means to some greater end, but an end in itself. It is without cavil that the public indecency statute is "narrowly tailored;" Indiana's requirement that the dancers wear at least pasties and a G–String is modest, and the bare minimum necessary to achieve the state's purpose.

*Barnes,* —— U.S. at ——, 111 S.Ct. at 2463.

The City ordinance in this case, section 5–11, is for all *practical* purposes indistinguishable from that addressed by the Supreme Court in *Barnes. See* discussion *supra* p. 142. Most notably, both laws prohibit *total* nudity. In *Barnes,* the dancers could have avoided being affected by the statute by simply wearing some small modicum of clothing. Considering the language of section 5–11, the same is true in this case. In addition, for the same reasons the United States Supreme Court ruled that the Indiana statute passed constitutional muster, this court believes that section 5–11 is constitutionally sound as well. Section 5–11 appears to be directed

toward promoting societal order and morality, which the Supreme Court has ruled is an important and substantial governmental interest. Moreover, the City's interest here, banning the asserted evil of public nudity, is aimed toward proscribing nudity *as a whole* and is not specifically directed at abridging expressive conduct in particular. In other words, the fact that section 5–11 happens to also affect expressive nudity, such as the nude dancing in this case, is merely an incidental effect of this facially neutral law. Finally, inasmuch as the dancers at Looker's could continue their performances without violating section 5–11 by wearing the slightest amount of clothing, such as the pasties or G–Strings described in *Barnes*, section 5–11 is narrowly tailored toward achieving the City's goals and does not suppress any more expressive conduct than is necessary to achieve the City's goals.

In short, based upon the rationale set forth in *Barnes*, the court believes that the City would be justified in prohibiting nude performances at Looker's pursuant to section 5–11. Stated in procedural terms, plaintiffs have failed to convince the court that they are likely to succeed on the merits of their claim insofar as it relates to section 5–11. Accordingly, issuance of a preliminary injunction preventing the City from enforcing section 5–11 is inappropriate, and plaintiffs' petition in that respect is denied.

## B. Chapter 44

■ Chapter 44 prohibits establishments which feature nude dancing, topless dancing, and stripping in areas that are within 1,000 feet of a residence, school, church or public park. This court temporarily restrained the City from enforcing Chapter 44 against Looker's based upon the court's belief that the statute was impermissibly enacted toward Looker's in particular. In so ruling, the court relied upon *754 Orange Ave., Inc. v. West Haven, Connecticut*, 761 F.2d 105 (2d Cir.1985), in which the Second Circuit invalidated a similar "1,000 feet" ordinance on grounds that the law was impermissibly enacted to regulate the plaintiff's new establishment in particular.

*See also Brady v. Colchester*, 863 F.2d 205 (2d Cir.1988). Since the claimed "impermissible enactment" of Chapter 44 provided an independent basis for enjoining its enforcement, this court had no need to review the facial validity of the ordinance at that time.

Having considered the evidence presented at the hearing, the court now vacates its order enjoining the enforcement of Chapter 44. The evidence—which remains uncontradicted—clearly indicates that Councilor Guy proposed the amendment to Chapter 44 in October, 1992, Looker's even existed. The record is replete with references, most notably by Councilors Guy and McCarty, that the Common Council as a whole considered the legislation in December, 1992, before plaintiffs publicized their plans for Looker's. If anything, the Common Council enacted Chapter 44 with an eye toward certain *other* proposed establishments, *i.e.*, those located on Wolf Street and Bruce Street. Given the chronology of events, one cannot rationally conclude that the legislation was geared specifically toward Looker's, especially when its principal backers had never even heard of Looker's until after they publicly supported the legislation. The fact that Chapter 44 was finally amended just one day before the scheduled opening of Looker's, while unfortunate in terms of timing for plaintiffs, by itself carries no First Amendment implications.

■ Having determined that Chapter 44 was not impermissibly enacted, the court turns next to examine the facial validity of that ordinance. To the extent that Chapter 44 generally regulates operation of establishments that feature nude and topless dancing, the ordinance is clearly valid in light of *Barnes*. The Supreme Court unambiguously ruled in that case that a requirement that dancers wear pasties *and* G-strings (*i.e.*, tops and bottoms) is a justifiable state regulation that does not violate the First Amendment. *Barnes*, — U.S. at —, 111 S.Ct. at 2463 (see discussion *supra* pp. 142–43). Significantly, the Indiana statute upheld in *Barnes* applied throughout the entire city. In accordance with *Barnes*, Chapter 44's regulation of estab-

lishments featuring nude dancing and top-less dancing would also be valid city-wide, *i.e.*, even without regard to the 1,000 feet limitations. Since the Chapter 44 restrictions would be valid throughout the entire city, the court need not become entangled in determining whether the ordinance's 1,000 feet limitation "allows for reasonable alternative avenues of communication," *see Renton*, 475 U.S. at 53, 106 S.Ct. at 932. If the city-wide ban in *Barnes* passed constitutional muster, then *a fortiori* Chapter 44's regulation, that does not extend to the entire city, would pass constitutional muster as well.

More difficult questions arise, however, concerning Chapter 44's regulation of establishments that feature "strippers." As became obvious during the hearing, the precise definition of "strippers" is arguably subject to multiple interpretations. When questioned by the court, Councilor Guy testified that he understands "strippers" to mean people who disrobe to the point at which the genitals or female breasts are exposed. Councilor McCarty, by contrast, defined "strippers" as "people who take of their clothes—to music." The Assistant Corporation Counsel generally agreed with Councilor Guy's definition of strippers. Plaintiffs point to the City's inability to consistently define "strippers" as an indication that the statute may be unconstitutionally vague.

 This court rejects plaintiffs' vagueness argument. While the City's construction of Chapter 44 might be entitled to some deference, the *court* is the final authority on issues of statutory construction. *E.g. Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981). The court must reject an interpretation which is inconsistent with the statutory mandate. *See id.* (citations omitted). It is true that when considered out of context, the term "strippers" certainly might be considered vague. *Cf., e.g.,*

*Grayned v. Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972) (laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly"). The court, however, may not consider this term in a vacuum. Instead, a term must be interpreted in the context in which it appears in the ordinance, *e.g. National Foods, Inc. v. Rubin*, 936 F.2d 656, 659–70 (2d Cir.1991), and the ordinance as a whole must be "construed in a way that will give force and effect to each of its provisions rather than render some of them meaningless." *Allen Oil Co. v. Commissioner*, 614 F.2d 336, 339 (2d Cir.1980); *accord, United States v. Bernier*, 954 F.2d 818, 819 (2d Cir.1992) ("courts must give effect to every word of a statute where possible").

When considered in the context of the ordinance as a whole, the term "strippers" carries a clear, independent meaning. Chapter 44 regulates establishments that feature nude dancers, topless dancers, *and* strippers. Under Councilor Guy's proffered definition of strippers (that the performer must disrobe to a state of total nudity or, for women, toplessness), any conduct outlawed as stripping would already be outlawed under Chapter 44's proscriptions against nude dancing or topless dancing; thus, the "strippers" proscription would be superfluous. Since the court must refrain from interpreting a statutory term in a way that renders it superfluous, the court cannot construe the term stripping as requiring nudity or toplessness. *Cf. Jews for Jesus, Inc. v. Jewish Community Relations Council*, 968 F.2d 286, 293 (2d Cir.1992); *Bernier*, 954 F.2d at 819. To give meaning to the term "strippers", then, the court must construe Chapter 44 as regulating establishments which feature individuals disrobing, even if those individuals merely disrobe to a bathing suit.[7]

---

**7.** This construction of strippers, when considered in the context of the whole ordinance, is not as sweeping as it might initially seem. For example, Chapter 44 clearly does not affect the person who simply disrobes to a bathing suit in a public park, because the ordinance does not regulate stripping *per se*. Rather, Chapter 44 merely regulates the location of *"establishments* which feature ... strippers, male and female" (emphasis added).

Regulating those establishments that feature dancers who merely strip to bathing suits raises new constitutional questions because such a restriction is significantly more intrusive than one that only regulates stripping to nudity or toplessness. The *Barnes* case does not apply here because that ruling hinged upon the Supreme Court's finding that the statute did *not* regulate dancing in G-strings and pasties and therefore did not infringe upon more First Amendment rights than necessary to achieve the government's objective. Here, however, Chapter 44 goes well beyond the restrictions discussed in *Barnes*. Because of its inclusion of the term "strippers", Chapter 44 *does* regulate establishments that feature dancing in G-strings and pasties (assuming that the performers stripped down to G-strings and pasties). Thus, the court must examine whether this particular aspect of Chapter 44 is also constitutional.

■ The degree of scrutiny which the court must use depends upon the type of regulation at issue. For example, ordinances which regulate a given type of speech under all circumstances invoke a higher level of judicial scrutiny than those ordinances which merely regulate the time, place and manner at which that speech can occur. *E.g. Olivieri v. Ward*, 801 F.2d 602, 605 (2d Cir.1986). Chapter 44's regulation of locations for establishments which feature stripping is a "time, place and manner" regulation because it does not place an outright ban on such establishments, but rather dictates only *where* they may locate within the City. In this respect, Chapter 44 is virtually indistinguishable from the ordinances reviewed by the Supreme Court in *Renton*, 475 U.S. at 43, 106 S.Ct. at 926 (prohibiting adult motion picture theatres from locating within 1,000 feet of any residential zone, church, park, or school), and *American Mini Theatres, Inc.*, 427 U.S. at 52, 96 S.Ct. at 2443 (prohibiting adult theatre within 1,000 feet of any two other "regulated uses" or within 500 feet of any residential zone), both of which the Court characterized as legitimate time, place and manner restrictions. Since Chapter 44 does not regulate the content of

plaintiffs' expression but instead merely regulates *where* plaintiffs may engage in such expression or the manner in which they do so, the ordinance is properly deemed a "time, place and manner" restriction. *Cf., e.g., Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 297–98, 104 S.Ct. 3065, 3070–71, 82 L.Ed.2d 221 (1984); *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647–49, 101 S.Ct. 2559, 2563–65, 69 L.Ed.2d 298 (1981).

■ Chapter 44 may be sub-categorized as a "content neutral" time, place and manner regulation on speech. Plaintiffs understandably take issue with this classification; after all, the ordinance treats establishments that feature strippers differently from other kinds of establishments. *Cf. Renton*, 475 U.S. at 49, 106 S.Ct. at 929. The ordinance is nonetheless deemed content-neutral because it is not aimed at the *content* of plaintiffs' expression, but is aimed instead at the secondary effects of that expression. *See id.; accord, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) ("[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not on others") (citations omitted); *Clark*, 468 U.S. at 295, 104 S.Ct. at 3070. The City presented considerable evidence, most notably through the testimony of Councilors Guy and McCarty, that Chapter 44, like the statute at issue in *Renton*, "is designed to prevent crime, protect the city's retail trade, maintain property values, and generally 'protect and preserve the quality of the city's neighborhoods, commercial districts, and the quality of urban life,' not the suppression of unpopular views." *Cf. id.* 475 U.S. at 48, 106 S.Ct. at 929 (citation omitted).

Both councilors testified as to their concerns about the effect that adult entertainment businesses would have on their surrounding neighborhoods. Councilor Guy provided especially detailed evidence of complaints by his constituents, including specific instances of undesirable conduct

that have already occurred at Looker's. *See supra* p. 138. There is no evidence suggesting that Chapter 44 was enacted as a direct assault upon the expression of those establishments that feature stripping; there is ample evidence indicating that the ordinance was enacted to prevent the "secondary effects" that such establishments might have.[8] Therefore, Chapter 44 is properly characterized as a content-neutral time, place and manner regulation.

■■■■■■■ As a content-neutral time, place and manner restriction, Chapter 44 is valid only if it is narrowly tailored toward serving a substantial governmental interest and allows for reasonable alternative avenues of communication. *E.g. Ward*, 491 U.S. at 791, 109 S.Ct. at 2753; *Clark*, 468 U.S. at 293, 104 S.Ct. at 3068; *accord International Eateries of Am., Inc. v. Broward Cty.*, 941 F.2d 1157, 1161–62 (11th Cir.1991) (explaining "three-part test"), *cert. denied*, — U.S. —, 112 S.Ct. 1294, 117 L.Ed.2d 517 (1992). The City has carried its burden of proving each element of this inquiry. First, with respect to the substantial governmental interest, the Supreme Court has stated on numerous occasions that the government has a substantial interest in "preserving the quality of urban life," *E.g. Renton*, 475 U.S. at 50, 106 S.Ct. at 930 (citing *American Mini Theatres*, 427 U.S. at 71, 96 S.Ct. at 2452), and preventing urban blight, *Taxpayers for Vincent*, 466 U.S. at 805, 104 S.Ct. at 2128. *See Berman v. Parker*, 348 U.S. 26, 32–33, 75 S.Ct. 98, 102–03, 99 L.Ed. 27 (1954); *see also Metromedia, Inc. v. San Diego*, 453 U.S. 490, 507–08, 101 S.Ct. 2882, 2892–93, 69 L.Ed.2d 800 (1981). "It is well settled that the state may legitimately exercise its police powers to advance esthetic values." *Taxpayers for Vincent*, 466 U.S. at 805, 104 S.Ct. at 2129.

■■■■ The City need not make an independent finding that establishments that feature strippers will have harmful secondary effects on the surrounding neighborhoods. The fact that the City relied upon the experiences of other municipalities satisfies the requirement that the statute not be based upon conclusory or speculative evidence. *Renton*, 475 U.S. at 50, 106 S.Ct. at 930; *International Eateries of Am., Inc.*, 941 F.2d at 1162. To that end, it is significant that the Supreme Court has noted on several occasions that "adult entertainment businesses" generally cause the harmful secondary effects that the City seeks to avoid through Chapter 44. *E.g. Barnes*, — U.S. at — – —, 111 S.Ct. at 2461–62; *Renton*, 475 U.S. at 51, 106 S.Ct. at 930; *American Mini Theatres*, 427 U.S. at 71, 96 S.Ct. at 2452. This court is convinced, at least at this preliminary stage, that the City's interests in preserving its residential neighborhoods and maintaining the integrity of other areas at which families might congregate, *to wit* parks, schools, and religious institutions, is a legitimate function of the City's zoning authority and furthers a substantial governmental interest. This court is also satisfied that Chapter 44's regulation of the location of establishments that feature stripping, even when that stripping does not result in total or partial nudity, is narrowly tailored toward furthering those interests.[9] *See International Eateries of Am., Inc.*, 941 F.2d at 1162–63.

The court is also satisfied that the ordinance leaves available sufficient alternative locations for these establishments. The City presented evidence that at least four percent of the City remains available for this type of conduct. The City's four percent estimate is graciously conservative,

---

8. Despite his representation that he is not an "expert" in First Amendment law, Councilor Guy, an attorney, was seemingly familiar enough with the *Renton* case to appreciate the importance of distinguishing between legislation that regulates "secondary effects" of expression and legislation that regulates the expression itself. He frequently—and hardly coincidentally—described the motivation behind Chapter 44 as a specific concern about the "sec-

ondary effects" that adult entertainment businesses would cause.

9. *Cf. generally Schad*, 452 U.S. 61, 101 S.Ct. 2176, in which the Court invalidated an antinudity ordinance because the government did not sufficiently justify it. Unlike the government in *Schad*, the City here has proffered sufficient evidence to justify its restrictions under the standards set forth in *Barnes* and *Renton*.

however, for it counts as "available" only whole lots that border a roadway; the City did not account for all of the partial lots that could be subdivided and are also available, nor did it account for lots that do not front a roadway. Inclusion of those lots would have been entirely appropriate, and would have increased the available acreage to more than five percent of the City, an amount that the Supreme Court found acceptable in *Renton*, 475 U.S. at 53, 106 S.Ct. at 931.[10]

Plaintiffs' argument that much of the four percent is already occupied by other businesses and is hence not truly "available" is without merit. The Supreme Court rejected this argument in *American Mini Theatres*, writing that "[t]he inquiry for First Amendment purposes is not concerned with economic impact." 427 U.S. at 78, 96 S.Ct. at 2456. The Court was more explicit in *Renton*, when it wrote:

> That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation. And although we have cautioned against the enactment of zoning regulations that have "the effect of suppressing, or greatly restricting access to, lawful speech," we have never suggested that the First Amendment compels the Government to ensure that adult theatres, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices.

475 U.S. at 54, 106 S.Ct. at 932.

In light of *American Mini Theatres* and *Renton*, the fact that much of the "available" space is already occupied is of no consequence to this analysis.[11] Chapter 44 leaves at least four percent—and more like-

ly at least five percent—of the City available to plaintiffs at which they may legally operate an establishment that features strippers. Thus, in accordance with *Renton*, Chapter 44 leaves available to plaintiffs sufficient alternative avenues for their communication and is, therefore, not overly broad. *See id.*, 475 U.S. at 53, 106 S.Ct. at 931. Insofar as it regulates the location of establishments that feature strippers, Chapter 44 is a valid content-neutral time, place and manner restriction.

In sum, the court finds that plaintiffs are not likely to succeed on their claim that Chapter 44 is unconstitutional or was otherwise unconstitutionally enacted. Therefore, a preliminary injunction enjoining the City from enforcing that ordinance would be inappropriate.

### C. Enforcement of zoning ordinances

Finally, plaintiffs argue that City officials have unlawfully harassed them through a scheme of discriminatory enforcement of zoning ordinances. Plaintiffs point to the apparently irrational manner by which the City enforced its zoning requirements against them as circumstantial evidence that the enforcement is in reality a pretext for a scheme of discrimination. Specifically in this regard, plaintiffs highlight defendant Ladd's notes concerning the strict and burdensome enforcement of Lookers' Special Permit as well as Vaughn's inability to explain the Special Permit requirements as evidence that this enforcement is a pretext for harassment and discrimination.

Indeed, the evidence revealed City zoning and enforcement practices that are so baffling that they border on the laughable. Plaintiffs obviously have felt the brunt of some of these practices. Most disturbing

---

**10.** In *Renton*, the Court included in its calculation of available land "acreage at all stages of development from raw land to developed, industrial, warehouse, office, and shopping space that is criss-crossed by freeways, highways, and roads." 475 U.S. at 53, 106 S.Ct. at 932.

**11.** The court notes in passing that plaintiffs spent undue time arguing that a significant portion of the available acreage is already occupied by Carousel Center, one of the largest shopping

malls in the region, and is thus not truly "available." Aside from being irrelevant from a legal standpoint, the argument is flawed because there is no indication that Chapter 44 would prevent plaintiffs from locating their establishment within Carousel Center itself. Any restrictions that Carousel Center might independently place upon the activities of its tenants are a matter of contract law and do not implicate the First Amendment.

is the City's insistence that Looker's apply for one Special Permit as a prerequisite to demolishing a kitchen wall—a requirement which by itself seems reasonable—and a *second* Special Permit which authorizes the resulting larger space. It should (but apparently does not) go without saying that, as a matter of common logic and physics, it is impossible for one to demolish a wall that separates two rooms without resulting in a larger room. The City's requirement that plaintiffs acquire a *separate* permit to authorize the resulting space after the demolition of the wall is puzzling, to say the least. The court empathizes with plaintiffs' frustration with such a procedure.

Nevertheless, while the court is convinced that the City's code enforcement procedures may need an overhaul, it cannot conclude that they were applied in a discriminatory manner against plaintiffs. The City's Director of Code Compliance, Mr. Vaughn, persuasively testified that the City followed its standard operating procedures in this case and did not discriminate against Looker's. In other words, Vaughn offered uncontradicted testimony that every citizen of Syracuse receives the same treatment. The court does not hesitate to express its ambivalence about Vaughn's assertion. While his statement, which the court accepts as true, defeats plaintiffs' claim that they suffered discriminatory treatment, it does not bode well for the other citizens of Syracuse who must similarly suffer through this bureaucratic nightmare. Fortunately, this matter of public policy is not for the court to resolve. The City's code enforcement procedures may be woeful, but they do not implicate the First Amendment or the equal protection clause.

The evidence adduced at the hearing did not fully support plaintiffs' claim that the City issued its Stop Work Orders in order to delay the opening of Looker's long enough to allow for the passage of Chapter 44. By plaintiffs' own admission, the City vacated its Stop Work Orders on January 5, 1993, as soon as plaintiffs filed their application for a new Special Permit. At that point plaintiffs were entitled to finish their preparations and open Looker's. In-stead of immediately opening Looker's to the public, however, plaintiffs independently decided to postpone the opening for approximately one week so that they could advertise. That is to say, plaintiffs made a *business* decision to delay the opening; City zoning officials did not prevent the opening. The City's non-interference with Lookers' opening was made most clear by the testimony of Mr. Santucci, the radio sales representative who stated that he observed a "ceremonial" show at Looker's on January 12, 1993, three days before Chapter 44 was formally amended. Just as City zoning officials did not prevent the ceremonial opening from taking place on January 12, neither did they prevent Looker's from formally opening to the public on that date. The decision to delay the opening was a business decision made solely by plaintiffs.

Plaintiffs' argument that they suffered from discriminatory treatment by City zoning officials is not supported by the evidence. At least at this preliminary stage of the litigation, plaintiffs have not convinced the court that they are likely to succeed on their claim of discriminatory treatment in violation of the Fourteenth Amendment. Therefore, a preliminary injunction which would affect City zoning practices as they relate to Looker's would be inappropriate.

### III. CONCLUSION

Although they have established that they will suffer irreparable harm if preliminary relief is not granted, plaintiffs have failed to convince the court that they are likely to succeed on the merits of any their claims. The court finds that section 5–11 and Chapter 44 of the City's Revised General Ordinances are likely constitutional and that neither was likely enacted with an impermissible motive. The court further finds that the City likely did not enforce its zoning ordinances against plaintiffs in an unconstitutional manner. Accordingly, the court vacates the extant temporary restraining order and denies in its entirety plaintiffs' application for a preliminary injunction.

Given the obvious complexity of the foregoing analysis, in the interest of clarity the court offers the following explanation of the effect of today's ruling. Underlying this explanation is the fact that section 5–11 effects a city-wide ban on total nudity, while Chapter 44 effects a ban on establishments that feature nude dancing, topless dancing, and strippers, male and female, only in certain limited areas of the City. With this as background, the court summarizes the effect of today's ruling as follows:

*First,* the City may restrict nude dancing at Looker's. Such a restriction would be valid under both section 5–11 and Chapter 44. Since section 5–11 provides an independent basis for outlawing nude dancing, the restriction may apply city-wide. Thus, nowhere in the City of Syracuse may plaintiffs operate an establishment that features totally nude dancing. Officials seeking to enforce the ordinances against totally nude dancing should note the distinction between section 5–11 and Chapter 44. Section 5–11 prevents dancers from appearing in a state of total nudity; it is directed at the dancers. By contrast, Chapter 44 prevents individuals from operating an establishment that features nude dancing; it is directed at the operator of the establishment, not the dancers.

*Second,* the City may also prevent plaintiffs from featuring topless dancing at the current Looker's site pursuant to Chapter 44. Since section 5–11 proscribes only total nudity, that statute does not provide the basis for this ruling; the restriction on topless dancing is grounded only on Chapter 44. The restriction on topless dancing at Looker's is valid only because Looker's falls within the reach of Chapter 44, *i.e.,* it is an establishment that features topless dancing within 1,000 feet of residences, schools, religious institutions, and public parks. Plaintiffs are entitled to operate an establishment that features topless dancing in areas of the City that are not affected by Chapter 44.

*Third,* the City may also prevent plaintiffs from featuring strippers at the current Looker's site pursuant to Chapter 44. To the extent that a stripper disrobes to a state of total nudity, the City may also restrict that conduct (pursuant to section 5–11) throughout the City. Plaintiffs are entitled to operate an establishment that features strippers in areas of the City that are not affected by Chapter 44, provided that the performers do not disrobe to a state of total nudity (which is still barred by section 5–11).

*Fourth,* when considered together, these ordinances leave a narrow window of opportunity for plaintiffs at the current site of Looker's. Combined, these ordinances only outlaw nudity, nude dancing, topless dancing, and stripping at locations covered by Chapter 44. The ordinances do not outlaw establishments that feature dancers who wear G-strings *and* pasties or bathing suits, provided that the those dancers arrive on the stage in that attire; the dancers may not strip down to that attire. If the performers disrobe to G-strings and pasties (or bathing suits, or even to nudity or toplessness) after arriving on the stage, then Looker's would arguably be considered an establishment that features "strippers" in violation of Chapter 44.

IT IS SO ORDERED.